1   Michael B. Reynolds (#174534)
    mreynolds@swlaw.com
2   J. Rick Taché (#195100)
    rtache@swlaw.com
3   Deborah S. Mallgrave (#198603)
    dmallgrave@swlaw.com
4   SNELL & WILMER L.L.P.
    600 Anton Boulevard, Suite 1400
5   Costa Mesa, California 92626-7689
    Telephone:  (714) 427-7000
6   Facsimile:   (714) 427-7799

7   Attorneys for Baby Trend, Inc.

8                   UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

10

11  GRACO CHILDREN'S PRODUCTS,            CASE NO. 2:10-CV-05897 JST
    INC.,                                 Hon. Josephine S. Tucker
12                                        Ctrm 10A
                        Plaintiff,
13                                        **Notice of Motion and Motion in**
    vs.                                   ***Limine*** **to Exclude the**
14                                        **Infringement and Invalidity**
    BABY TREND, INC.,                     **Analysis of Graco's Expert Robert**
15                                        **Anders**
                        Defendant.
16                                        Judge: Hon. Josephine S. Tucker

17                                        Date: November 28, 2011
                                          Time: 1:30 p.m.
18                                        Courtroom: 10A

19

20  **TO THE DISTRICT COURT AND PARTIES IN INTEREST:**

21          **PLEASE TAKE NOTICE** that, by submission to the Honorable Josephine

22  S. Tucker of the United States District Court for the Central District of California,

23  Defendant Baby Trend, Inc. ("Baby Trend"), hereby moves the court *in limine* for

24  an order: (i) excluding the infringement and invalidity analysis of Graco's expert

25  Robert Anders; and (ii) preclude Anders from rendering an opinion on his

26  perception of an "ordinary observer."

27          This motion is made pursuant to the Court's Order of Jury Trial and Local

28  Rule 6-1. It is made on the grounds that Anders' infringement analysis is irrelevant,

13947553.6

MIL to Exclude the Infringement and Invalidity Analysis of
R. Anders
Case No. 2:10-cv-05897-JST

*Snell & Wilmer*
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  unreliable and inadmissible because it is based on an improper and narrow

2  comparison of a representative sample of the accused product with a single piece of

3  prior art and the patent drawing. *See* Fed. R. Evid. 401, 402 and 702. Moreover,

4  Anders, who is offered as an expert skilled in the art of product design, cannot

5  opine as an "ordinary observer." His conclusory analysis, thus, on both

6  infringement and invalidity fails to meet the reliability standards for an expert

7  testimony and lacks foundation. *See* Fed. R. Evid. 702. Finally, even if Anders'

8  opinions pass the muster of relevancy and reliability (which they do not), his flawed

9  methodology and opinions would unfairly prejudice Baby Trend, confuse the jury

10  and cause undue delay. *See* Fed. R. Evid. 403.

11  As such, Defendant moves the court *in limine* for an order excluding Anders'

12  opinions and testimony with respect to design patent infringement and invalidity.

13  Alternatively, if the court believes the offending evidence can be excised, the court

14  should preclude Graco from offering testimony or other evidence that (i) is related

15  to Anders' flawed infringement approach that uses a single piece of prior art to

16  imply that accused products infringe, because they were closer to the patent than

17  the prior art and (ii) that expresses the ultimate opinion of the perception of an

18  ordinary observer with respect to infringement and invalidity.

19  This motion is made following the Local Rule 16-2 Meeting of Counsel

20  Before Final Pretrial Conference and the discussion of evidentiary matters pursuant

21  to Local Rule 16-2.6, which took place on October 17 (telephonically), October 21

22  (telephonically), and October 27, 2011 (in-person meeting). This specific motion

23  was discussed on October 27, 2011.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

This motion is based on this notice of motion and the attached memorandum of points and authorities, the attached Declaration of Deborah S. Mallgrave, the pleadings and records on file with the court in this action, and on such other and further argument and evidence as the court may properly receive.

DATED: October 31, 2011          Respectfully submitted,

SNELL & WILMER L.L.P.


By: /s/ Deborah S. Mallgrave
    Michael B. Reynolds
    J. Rick Taché
    Deborah S. Mallgrave
    Attorneys for Baby Trend, Inc.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

iii

MIL to Exclude the Infringement and Invalidity Analysis
of R. Anders
Case No. 2:10-cv-05897-JST

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................ 1

II.  Statement of facts .................................................................................. 2

    A.  Initial Report .................................................................................. 2

    B.  Rebuttal Report .............................................................................. 3

III.  Legal Standard ...................................................................................... 4

IV.  ANDERS' INFRINGEMENT OPINIONS ARE BASED ON
IMPROPER ANALYSIS ........................................................................... 5

    A.  Proper Inquiry for Infringement Under *Egyptian* Goddess ................. 5

    B.  Anders Misapplies Prior Art Frame of Reference ............................... 6

    C.  Anders Ignores 1200 pieces of Prior Art and fails to create a
"Frame of Reference" ....................................................................... 8

V.  ANDERS CANNOT OPINE AS AN ORDINARY OBSERVER IN
EITHER HIS INFRINGEMENT OR INVALIDITY ANALYSIS ............. 10

    A.  Ordinary Observer Standards for Infringement and Invalidity ........... 10

    B.  Anders' Conclusions as an Ordinary Observer are inadmissible
under Rule 401, 402 and 403 ............................................................ 10

    C.  Anders' Conclusions as an Ordinary Observer are Inadmissible
under Rule 702 ................................................................................ 12

VI.  CONCLUSION ..................................................................................... 13

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

# TABLE OF AUTHORITIES

**Page**

### Federal Cases

*Am. Med. Sys. v. Laser Peripherals, LLC,*
712 F. Supp. 2d 885 (D. Minn. 2010) ................................................8

*Amini Innovation Corp. v. KTY Int'l Mktg.,*
768 F. Supp. 2d 1049 (C.D. Cal. 2011) ..............................................5

*Braun Inc. v. Dynamics Corp. of Am.,*
975 F.2d 815 (Fed. Cir. 1992) ........................................................10

*Bush Industries, Inc. v. O'Sullivan Industries, Inc.,*
772 F. Supp. 1442 (D. Del. 1991) ....................................................12

*Contessa Food Prods, Inc. v. Conagra, Inc.,*
282 F.3d 1370 (Fed. Cir. 2002) .......................................................11

*Crocs, Inc. v. ITC,*
598 F.3d 1294 (Fed. Cir. 2010) .......................................................5, 6

*Daubert v. Merrell Dow Pharms.,*
509 U.S. 579 (1993) .......................................................................4, 5

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
543 F.3d 665 (Fed. Cir. 2008) ...........................................5, 6, 8, 9, 10

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,*
162 F.3d 1113 (Fed. Cir. 1998) .......................................................10

*Great Neck Saw Mfrs., Inc. v. Star Asia U.S.A., LLC,*
727 F. Supp. 2d 1s38, (W.D. Wash. 2010).........................................6, 7, 8, 9

*Hebert v. Lisle Corp.,*
99 F.3d 1109, Fed. Cir. 1996) ..........................................................8

*Int'l Seaway Trading Corp. v. Walgreens Corp.,*
59 F.3d 1233 Fed. Cir. 2009) ..........................................................10

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ...................................................................................5

*Richardson v. Stanley Works, Inc.,*
    597 F.3d 1288 (Fed. Cir. 2010) ...............................................................5

*United States v. Hankey,*
    203 F.3d 1160 (9th Cir. 2000) .................................................................5

*United States v. Prime,*
    431 F.3d 1147 (9th Cir. 2005) .................................................................5

*Viterbo v. Dow Chemical Co.,*
    826 F.2d 4205th Cir. 1987) ................................................................5, 8

*Wing Shing Prods. (BVI) Co. v. Sunbeam Prods.,*
    665 F. Supp. 2d 357 (S.D.N.Y. 2009) ..................................................6, 7

## Federal Rules

Fed. R. Evid. 401 .................................................................... 1, 8-10, 12

Fed. R. Evid. 402 ........................................................................8, 10, 12

Fed. R. Evid. 403 ...................................................................... 8-10, 12

Fed. R. Evid. 702 ...........................................................................9, 12

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

MIL to Exclude the Infringement and Invalidity Analysis of R. Anders
Case No. 2:10-cv-05897-JST

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## <u>INTRODUCTION</u>

Baby Trend seeks an order precluding the introduction of testimony or any other evidence relating to the infringement or invalidity analysis by the plaintiff's expert witness Robert Anders.

As a threshold matter, Anders' opinions and testimony regarding infringement are based on an improper assumption and erroneous methodology and, thus, have no relevance to any issue in this action. Fed. R. Evid. 401. Anders misapplies prior art by improperly assuming that infringement occurs when an accused product is closer to the patented product than his chosen single piece of prior art. He also ignores 1200 pieces of other prior art and fails to create a "frame of reference," as required by an unanimous *en banc* Federal Circuit decision. These flaws undermine the credibility of his opinions and testimony, rendering them irrelevant, unreliable and inadmissible. Finally, Anders offers opinions as an ordinary observer, which he is not qualified to render since he provides no survey evidence or other factual foundation. His testimony relating to invalidity and infringement, thus, is also inadmissible.

Because Anders' report is imbedded with erroneous methodology and improper conclusions, his opinions and testimony also fail to meet the reliability standards for expert testimony imposed by Rule 702. As the gatekeeper of expert testimony, the Court should exclude them. Even if Anders' purported opinions and testimony pass muster under Rule 702 (which they do not), their lack of reliability causes their probative value, if any, to be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Therefore, they should also be excluded under Rule 403.

For these reasons, Baby Trend respectfully requests the Court to exclude Anders' opinions and testimony with respect to infringement and invalidity at trial

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  or otherwise.

## II.

## STATEMENT OF FACTS

Graco Children's Products Inc. ("Graco") retained Robert Anders as an expert witness to opine on design patents in general, and on whether Baby Trend's accused products infringe U.S. Patent No. D448,218 (the "'218 patent"). [Declaration of Deborah S. Mallgrave ("Mallgrave Decl.") ¶ 3, Ex. 1 (Expert Report of Robert Anders ("Initial Report") at ¶ 2).]

### A.  **Initial Report**

Graco served Anders' Initial Report on August 11, 2011. [*Id.* (Initial Report).] In his Initial Report, Anders claimed to understand that "a design patent is infringed when an ordinary observer, familiar with the prior art, would be deceived into thinking that the ornamental aspect of the accused design was the same as the ornamental aspect of the patented design. . ." [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶ 22.6).]

To determine infringement, however, Anders followed his own three part methodology. [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶ 45).] Anders does not cite to any authority to support this approach. Under Anders' approach, he first photographically documented the representative accused products from the same view points as the '218 patent design. [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶ 45.2).] Second, Anders conducted a "review" of over 1200 patents and chose one single design that has the "the closest example of prior art to the design claimed in the '218 patent." [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶¶ 50, 51).] Anders chose U.S. Patent D323,589 as the "closest" example of prior art. [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶ 51).] Third, Anders assembled a visual presentation with the two above components, side-by-side with the drawings of the '218 patent.[1] [*Id.* ¶ 3, Ex. 1

---

[1] Anders did not assess the accused products with the "bells and whistles" in place because, according to Anders, they are "superfluous and extraneous." Mallgrave Decl. ¶ 3, Ex. 1 (Initial Report at ¶ 52).

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1    (Initial Report at ¶ 25.3).]

2        Anders used this visual ensemble to compare four representative accused

3    products with a single item of prior art and the drawings of the '218 patent. Anders

4    evaluated whether the accused product is closer to his one piece of prior art or the

5    drawings of the '218 patent. [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶¶ 56, 59, 62, 65).] On

6    each of his representative accused products, Anders opined, without any

7    explanation or analysis, that "the overall ornamental appearance of the accused

8    product is substantially more similar to the '218 patent design than it is to the

9    [chosen single piece of prior art.]" [*Id.* ¶ 3, Ex. 1 (Initial Report at Tables 6-9, pp.

10   27-38).] From this analysis, Anders, then, determined that an "ordinary observer,

11   with knowledge of the prior art, giving such attention as a purchaser usually gives,

12   would be induced to purchase the accused playard supposing it to be the patented

13   playard." [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶¶ 57, 60, 63, 66).] Anders concluded

14   from this "test" that all four of the representative products infringe the '218 patent.

15   [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶ 68).]

16       Anders also purported to rely on the "ordinary observer" test to determine

17   whether Baby Trend's accused products infringed the '218 patent. [*Id.* ¶ 3, Ex. 1

18   (Initial Report at ¶¶ 24, 42).] Anders claimed to have "developed an understanding

19   of how an ordinary observer views products in the marketplace" by conducting

20   research as to how shoppers and visitors interacted with products. [*Id.* ¶ 3, Ex. 1

21   (Initial Report at ¶ 13).] Anders did not explain the purpose of his prior research

22   type, his methodology, the products involved, the sample size or the conclusions

23   drawn. Notably, Anders does not point tor any "research" involving products at

24   issue in this trial.

25   **B.**    **Rebuttal Report**

26       On August 19, 2011, Anders issued his rebuttal report to Baby Trend's

27   expert, Dr. Michael McCarthy. [*See* Mallgrave Decl. ¶ 4, Ex. 2 (Expert Rebuttal

28   report of Robert Anders ("Rebuttal Report") at ¶ 40).] This report only focused on

invalidity.

In conducting his validity analysis, Anders opined as an ordinary observer. First, he opines that in constructing the claim "ordinary observers do not dissect designs into minute components as Dr. McCarthy attempts to do here. Rather, ordinary observers take in the overall design." [*Id.* ¶ 4, Ex. 2 (Rebuttal Report at ¶ 33).] He also opines that "even if an ordinary designer did combine the references, they would not add up to a single piece of art that an ordinary observer (or an ordinary designer) would find to be substantially similar to the design claimed in the '218 Patent." [*Id.* ¶ 4, Ex. 2 (Rebuttal Report at ¶ 40).] Finally, Anders concludes that an ordinary observer would not find substantial similarity between Dr. McCarthy's two references and the '218 patent. [*Id.* ¶ 4, Ex. 2 (Rebuttal Report at ¶¶ 45.2, 45.3).]

Anders offers no additional support as to how or why he is qualified to opine as an "ordinary observer."

### III.

### LEGAL STANDARD

Expert testimony is only admissible if it is relevant (*i.e.*, will assist the trier of fact to understand the evidence or to determine a fact in issue), if the witness is qualified as an expert, and if the proposed testimony is reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993). Although Baby Trend does not concede that Robert Anders is a qualified expert, this motion focuses on the first and last requirements for expert testimony— that it be relevant and reliable.

Under Federal Rule of Evidence 702, expert testimony is sufficiently reliable "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This Rule imposes a "gatekeeper" role on the trial judge to ensure that unreliable testimony is excluded. *Daubert*, 509 U.S. at 589. Although *Daubert* sets forth

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1    several factors (peer review, publication, potential error rate, etc.) regarding

2    reliability, they are not a definitive checklist or test. *Kumho Tire Co. v. Carmichael*,

3    526 U.S. 137, 150 (1999); *United States v. Prime*, 431 F.3d 1147, 1152 (9th Cir.

4    2005) (factors set forth in *Daubert* are not exhaustive). Instead, a determination of

5    the reliability of expert testimony depends on the particular circumstances of the

6    particular case at issue. *Id.* Not only does the trial court have "considerable leeway"

7    in the method on which it bases its reliability inquiry, but also the ultimate

8    determination of whether the proposed expert testimony is reliable. *Id.* Thus, the

9    trial court can consider the specific Daubert factors depending on the facts of the

10   case. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

11       Federal Rule of Evidence 403 also allows the trial court to exclude evidence

12   when its "probative value is substantially outweighed by the danger of unfair

13   prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403;

14   *Hankey*, 203 F.3d at 1168; *see also Viterbo v. Dow Chemical Co.*, 826 F.2d 420,

15   422 (5th Cir. 1987) ("lack of reliable support [for expert opinion] may render it

16   more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403").

17                                         **IV.**

18   **ANDERS' INFRINGEMENT OPINIONS ARE BASED ON IMPROPER**

19                                    **ANALYSIS**

20   A.    **Proper Inquiry for Infringement Under *Egyptian Goddess***

21       Design patent infringement is a question of fact, which a patentee must prove

22   by a preponderance of the evidence. *Richardson v. Stanley Works, Inc.*, 597 F.3d

23   1288, 1295 (Fed. Cir. 2010). The patentee must establish that "an ordinary

24   observer, familiar with the prior art . . . , would be deceived into believing the

25   [allegedly infringing design] is the same as the patented [design.]" *Egyptian*

26   *Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 681 (Fed. Cir. 2008); *Crocs, Inc. v. ITC*,

27   598 F.3d 1294, 1303 (Fed. Cir. 2010); *Amini Innovation Corp. v. KTY Int'l Mktg.*,

28   768 F. Supp. 2d 1049, 1055 (C.D. Cal. 2011).

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1    The ordinary observer inquiry requires a determination of whether the

2    claimed design and the accused design are sufficiently distinct. *Egyptian Goddess*,

3    543 F.3d at 678. If they are not readily distinguishable, the fact-finder utilizes prior

4    art as a "frame of reference" since "it can be difficult to answer the question

5    whether one thing is like another without being given a frame of reference." *Id.* at

6    676-77. The hypothetical ordinary observer is "aware of the great number of closely

7    similar prior art designs," and "conversant with the prior art." *Id.* at 676, 678. Prior

8    art provides a context through which the claimed patent and the accused product

9    can be compared, because "[w]hen the differences between the claimed and

10   accused design are viewed in light of the prior art, the attention of the hypothetical

11   ordinary observer will be drawn to those aspects of the claimed design that differ

12   from the prior art." *Id.* at 676. Simply put, to determine whether an alleged product

13   infringes, the fact-finder must ask "whether the two designs in question appear

14   'substantially the same' to an ordinary observer who is already familiar with the

15   prior art." *Wing Shing Prods. (BVI) Co. v. Sunbeam Prods.*, 665 F. Supp. 2d 357,

16   361 (S.D.N.Y. 2009).

17   Therefore, "[t]he proper comparison requires a side-by-side view of the

18   drawings of the [patent at issue] and the accused product" and the role of the prior

19   art is to provide a frame of reference. *Crocs Inc.*, 598 F.3d at 1308; *Egyptian*

20   *Goddess*, 543 F.3d at 676; *see also Great Neck Saw Mfrs., Inc. v. Star Asia U.S.A.,*

21   *LLC*, 727 F. Supp. 2d 1038, 1057-58 (W.D. Wash. 2010).

22   **B.**    **Anders Misapplies the Prior Art Frame of Reference**

23   Rather than use the prior art as a frame of reference, Anders incorrectly

24   assumes that infringement can be shown when an accused product is more similar

25   to the patent than a single piece of prior art. [*See* Mallgrave Decl. ¶ 3, Ex. 1 (Initial

26   Report at Table 6-9).] The implication that if an accused product is more similar to

27   the claimed patent than to a single prior art reference, then it must infringe, is

28   contradicted by both logic and relevant case law. Simply put, "whether the accused

device is 'closer' to the patented design than to the prior art is not the controlling inquiry." *Wing Shing Prods. (BVI) Co.*, 665 F. Supp. 2d at 368; *Great Neck Saw*, 727 F. Supp. 2d at 1058.

Here, Anders argues that because A is closer to B than A is to C, A infringes on B. After setting up his tables with pictures of A (the accused product), B (the claimed patent) and C (the prior art), Anders purports to determine – without explanation – that the accused products are "substantially more similar to the '218 patented design than it is to the nearest prior art." [*See* Mallgrave Decl. ¶ 3, Ex. 1 (Initial Report at Tables 6-9).] Anders then claims that just because a representative sample is more similar to the '218 patent than to the single prior art, that the representative sample is substantially similar to the '218 patent. [*Id.* ¶ 3, Ex. 1 (Initial Report at ¶¶ 57, 60, 63, 66).] From this "test," Anders concludes that infringement has occurred under the ordinary observer standard. As stated above, this is simply not the test for infringement of a design patent.

The expert in *Great Neck Saw* attempted to utilize a similar method. In *Great Neck Saw*, the plaintiff's expert Mr. Miskin "selected a particular prior art design and opined that the [accused product] and the claimed design are more similar to each other than they are to the prior art." *Great Neck Saw*, 727 F.Supp.2d at 1058. The District Court confirmed that Mr. Miskin's method was "inconsistent with the teachings of the Federal Circuit and entirely unhelpful." *Id.* The court outright "reject[ed] Great Neck's implicit contention that, because the accused device and a particular claimed design are both distinct from a single prior art reference, infringement of the claimed design has been demonstrated." *Id.* The Court held that Mr. Miskin's analysis did not create a factual dispute and granted defendant's summary judgment on patent infringement. *Id.* ; *see also Yokohama Rubber Co. v. Stamford Tyres Int'l PTE LTD,* 2010 U.S. Dist. LEXIS 48671, at *11 (C.D. Cal. Jan. 19, 2010) (rejecting plaintiff's summary judgment because triable issues remained despite the plaintiff's expert's conclusion that "[the alleged product] is far

1   closer to the patented design than any of the alleged prior art").

2        Moreover, the flawed implication imbedded in Anders' methodology is

3   improper. Rather than use his chosen prior art reference as a frame of reference,

4   Anders used the prior art to improperly assume that the accused products had to be

5   closer to, and infringe, either the prior art or the '218 Patent. A relative comparison

6   with two items cannot support a conclusion of substantial similarity and

7   infringement.

8        As such, Anders' testimony and report with respect to infringement is based

9   on incorrect legal assumptions and is irrelevant, unreliable and highly prejudicial.

10  *See, e.g., Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 901 (D.

11  Minn. 2010) (excluding expert's opinions because "they are based on incorrect

12  legal standards.") *citing Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996).

13  It should, therefore, be excluded under Rule 702 and Rule 401, 402 and 403.

14  *Benhabib v. Hughes Elecs. Corp.*, 2006 U.S. Dist. LEXIS 97019, *5 (C.D. Cal.

15  Sept. 6, 2006) (excluding expert opinion because they were "not the product of

16  reliable principles and methods applied to the facts of the case, as required under

17  Fed. R. Evid. 702") (internal citations omitted); *Viterbo*, 826 F.2d at 422 ("lack of

18  reliable support [for expert opinion] may render it more prejudicial than probative,

19  making it inadmissible under Fed. R. Evid. 403").

20  **C.   Anders Ignores 1200 pieces of Prior Art and fails to create a "Frame of**

21       **Reference"**

22       Anders' infringement analysis also focuses on a single piece of prior art and

23  ignores the other 1200 prior art references identified in his report. *See Great Neck*

24  *Saw*, 727 F. Supp.2d at 1057-58.

25       As explained above, under the "ordinary observer" test, an array of prior art

26  is used to give context to the designs at issue. When prior art consists of a "field . . .

27  crowded with many references relating to the design of the same type of appliance,"

28  the protection afforded to the patent is in a "narrow range." *See Egyptian Goddess*,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

543 F.3d at 676. Consequently, "when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important." *Id.* at 543 F.3d at 676. In sum, the fact-finder must be "conversant with the prior art." *Id.*

Here, Anders conceded that there were over 1200 pieces of prior art. From these 1200 pieces of prior art, Anders claims to have "narrowed" the potential designs down to five and then down to one to find the prior example that is allegedly "closest in the overall appearance taught by the '218 patent." [*See* Mallgrave Dec. ¶ 3, Ex. 1 (Initial Report at ¶¶ 50, 51).] Thus, rather than considering the whole field of prior art, Anders, erroneously fixates on a single piece of prior art. Anders' approach is inherently inconsistent and counter to the test of infringement of a design patent as set forth in *Egyptian Goddess*. Under *Egyptian Goddess*, it is not appropriate to choose one – or the best prior art design – but a frame of reference should consist of "numerous similar prior art designs" where "those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer." 543 F.3d at 677; *see also, e.g.,* *Great Neck Saw*, 727 F. Supp. 2d at 1058 (finding the expert's analysis that simply compares "a single prior art reference" with accused product and the patented design to be "inconsistent with the teachings of the Federal Circuit and entirely unhelpful"). Anders' methodology is, therefore, improper and his testimony with respect to infringement should be excluded as irrelevant and unreliable. *See* Fed. R. Evid. 401, 402, 403 and 702.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

# V.

## ANDERS CANNOT OPINE AS AN ORDINARY OBSERVER IN EITHER HIS INFRINGEMENT OR INVALIDITY ANALYSIS[2]

### A.    Ordinary Observer Standards for Infringement and Invalidity

Infringement and invalidity analysis both employ the same "ordinary observer" test. To establish design patent infringement, Graco must show that an "ordinary observer" familiar with the prior art, giving such attention to the '218 patented design an ordinary purchaser normally gives, would be deceived into believing the designs are the same. *Egyptian Goddess,* 543 F.3d at 681 (*citing Gorham Co. v. White*, 81 U.S. 511, 528 (1872)). Similarly, to establish invalidity, the "ordinary observer" test is the "sole" applicable test. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 59 F.3d 1233, 1241 (Fed. Cir. 2009). As the Federal Circuit has noted, "[o]nce [a] piece of prior art has been constructed, obviousness, like anticipation, requires application of the ordinary observer test, not the view of one skilled in the art." *Id.* at 1240.

### B.    Anders' Conclusions as an Ordinary Observer are Inadmissible Under Rule 401, 402 and 403

A panel of jurors constitutes a sampling of "ordinary observers" for the purposes of design patents. *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 821 (Fed. Cir. 1992). Courts have, thus, made it clear that the "ordinary observer" does not include industry professionals or experts. *Chef'n Corp. v. Trudeau Corp.*, 2009 U.S. Dist. LEXIS 47013, *5 (W.D. Wash. June 4, 2009) ("[E]xpert opinions on ordinary observers' thoughts or perceptions will not assist the trier of fact."); *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,* 162 F.3d 1113, 1117 (Fed. Cir. 1998) (noting that Gorham "counsels against measuring the similarity of

---

[2] While both Anders and Baby Trends' expert Michael McCarthy opine on how an ordinary observer would interpret the prior art, Baby Trend contends that neither expert should be allowed to render an ultimate opinion on the perception of the ordinary observer.

1   designs from the viewpoint of experts in design" because experts are not the

2   principal purchasers of the products); *Contessa Food Prods, Inc. v. Conagra, Inc.*,

3   282 F.3d 1370, 1381-82 (Fed. Cir. 2002) ("[O]ur precedent in making the required

4   comparison counsels against measuring the similarity of designs from the viewpoint

5   of experts in design. Analysis under the 'ordinary observer' test is to be conducted

6   with the 'ordinary observer' and not the expert in mind"); *Cotapaxi Custom Design*

7   *& Mfg., LLC v. Corporate Edge, Inc.*, 2007 U.S. Dist. LEXIS 73172, at *8 (D.N.J.

8   Sept. 28, 2007) ("The ordinary observer test requires that an average person, not an

9   expert, compare the patent drawings to the allegedly infringing product, and any

10  significant differences in configuration and general appearance, as they present

11  themselves to the average buyer of the article on inspection, will be sufficient to

12  avoid infringement.") (citation omitted).

13      Here, Anders opined on how an ordinary observer would determine

14  infringement and invalidity. In his Initial Report, Anders opines that "an ordinary

15  observer. . . would be induced to purchase the accused playard supposing it to be

16  the patented playard." [Mallgrave Dec. ¶ 3, Ex. 1 (Initial Report at ¶¶ 57, 60, 63,

17  66).] Similarly, in his Rebuttal Report, Anders opines that "ordinary observers do

18  not dissect designs," and that "ordinary observer would not find substantial

19  similarity [with the prior art] . . ." [*Id.* ¶ 4, Ex. 2 (Rebuttal Report at ¶¶ 33, 45.2,

20  45.3).]

21      While an expert may present the prior art to the trier of fact, the ultimate

22  opinion of whether a design is deceptively similar (infringement) or obvious in light

23  of the prior art (invalidity) is the province of the trier of fact. Since experts are, by

24  definition, not ordinary observers (but skilled in the art) such opinion testimony as

25  to how an ordinary observer would perceive the prior art is not relevant or

26  otherwise helpful to the jury. To the contrary, such opinion testimony is more likely

27  to be prejudicial and confuse the jury by providing open testimony as to what they

28  themselves, as ordinary observers, are capable of determining. These conclusions of

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  law interpose the role of the jury and are irrelevant. They are, thus, inadmissible

2  under Rule 401, 402, 403.

3  **C.**   <u>**Anders' Conclusions as an Ordinary Observer are Inadmissible under**</u>

4  <u>**Rule 702**</u>

5  Anders also purports to understand how an ordinary observer views products

6  in the marketplace. Expert opinion, however, must be reliable and be based on

7  "sufficient facts or data." Fed. R. Evid. 702. An expert opining as an ordinary

8  observer "lack[s] a sufficient factual basis [when] there is no evidence that the

9  opinions are based on consumer surveys or interviews." *Chef'n Corp.*, 2009 U.S.

10  Dist. LEXIS 47013 at *5.

11  In his Initial Report, Anders claims to have "developed an understanding of

12  how an ordinary observer views products in the marketplace," because he has

13  conducted research as to how shoppers and visitors interacted with products.

14  [Mallgrave Dec. ¶ 3, Ex. 1 (Initial Report at ¶ 13).]  Anders, however, fails to

15  provide any market research or empirical data to substantiate his claimed

16  knowledge. Moreover, he does not indicate whether any of his research related to

17  playyards. His career as a designer and knowledge of design patents hardly allow

18  him to speak for the everyday shoppers who encounter the specific playards at issue

19  in this case. His report lacks factual basis to show how he determined that an

20  ordinary observe would concur with his conclusions with respect to infringement.

21  *See also Bush Industries, Inc. v. O'Sullivan Industries, Inc.*, 772 F. Supp. 1442,

22  1450 (D. Del. 1991) (holding that the declaration of an expert "does not present the

23  viewpoint of an ordinary observer" and granting defendant's summary judgment

24  motion for noninfringment despite testimony by plaintiff's expert that designs were

25  the same); *Keystone Retaining Wall Sys. v. Rockwood Retaining Wall*, Inc., 2001

26  U.S. Dist. LEXIS 26272 (D. Minn. Oct. 9, 2001) (granting defendant's motion *in*

27  *Limine* to exclude testimony of plaintiff's expert under Fed. R. Evid. 402, 403, and

28  702 because design patent infringement "is to be determined from the viewpoint of

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

an ordinary observer, not an expert" and expert testimony "will not be of assistance to the jurors").

Because Anders' opinions on how ordinary consumers perceive playards lacks any factual foundation, they are inadmissible as unreliable under Fed. R. Evid. 702 and should not be considered at trial. As such, his testimony or any related evidence regarding infringement and invalidity should be excluded.

## VI.

## CONCLUSION

For the foregoing reasons, Baby Trend respectfully request that this Court grant this Motion and issue an order to preclude Graco's expert from applying improper legal standard.

DATED:. October 31, 2011        Respectfully submitted,

SNELL & WILMER L.L.P.


By: /s/ Deborah S. Mallgrave
    Michael B. Reynolds
    J. Rick Taché
    Deborah S. Mallgrave
    Attorneys for Baby Trend, Inc.

## DECLARATION OF DEBORAH S. MALLGRAVE

I, Deborah S. Mallgrave, declare as follows:

1.     I am an attorney licensed to practice law in all courts in the State of California. I am an associate in the law firm of Snell & Wilmer L.L.P., and one of the attorneys of record for Defendant Baby Trend, Inc. ("Baby Trend") in the above-entitled lawsuit. I have personal knowledge of the facts set forth below and if called to testify as a witness I could competently testify to them.

2.     I make this declaration in support of Defendant's motion *in Limine* to Preclude Graco's expert from applying improper legal standard

3.     Attached as Exhibit 1 is a true and correct copy of the Expert Report of Robert Anders, served to me on August 11, 2011.

4.     Attached as Exhibit 2 is a true and correct copy of the Rebuttal Report of Robert Anders, served to me on August 19, 2011.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on October 31, 2011, at Costa Mesa, California.

Deborah S. Mallgrave

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Exhibit 1

Exhibit 1
- 15 -

1   PENNY M. COSTA (SBN 110373)
    costap@ballardspahr.com
2   **Ballard Spahr LLP**
    2029 Century Park East, Suite 800
3   Los Angeles, California 90067-2909
    Telephone:  (424) 204-4331
4   Facsimile:  (424) 204-4350

5   LYNN E. RZONCA (*admitted pro hac vice*)
    rzoncal@ballardspahr.com
6   **Ballard Spahr LLP**
    1735 Market Street, 51st Floor
7   Philadelphia, PA 19103
    Telephone: (215) 665-8500
8   Facsimile: (215) 864-8999

9   KATRINA M. QUICKER (*admitted pro hac vice*)
    quickerk@ballardspahr.com
10  **Ballard Spahr LLP**
    999 Peachtree Street, Suite 1000
11  Atlanta, GA 30309-3915
    Telephone: (678) 420-9300
12  Facsimile: (678) 420-9301

13  Attorneys for Plaintiff Graco Children's
    Products Inc.

14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17

18  GRACO CHILDREN'S PRODUCTS          CASE NO. CV 10-05897-JST
    INC.,
19                                     [Assigned for all purposes to the
                      Plaintiff,       Honorable Josephine S. Tucker]
20
          v.                           **EXPERT WITNESS DISCLOSURE
21                                     OF PLAINTIFF GRACO
    BABY TREND, INC.,                  CHILDREN'S PRODUCTS INC.**
22
                      Defendant.       **[Fed. R. Civ. P. 26(a)(2)]**
23

24

25                                     Complaint Filed:  August 9, 2010
                                       Trial Date:  December 13, 2011
26

27

28

    ———————————————————————————————————————————————
    EXPERT WITNESS DISCLOSURE OF GRACO CHILDREN'S PRODUCTS INC.

**Exhibit 1**
**- 16 -**

1  **TO DEFENDANT BABY TREND, INC. AND ITS ATTORNEYS OF**
2  **RECORD:**

3      Plaintiff Graco Children's Products Inc. ("Graco") hereby designates Robert
4  John Anders as an expert witness in this matter pursuant to Federal Rule of Civil
5  Procedure 26(a)(2).  Mr. Anders is the owner of Robert Anders, A Design
6  Consultancy, located at 78 Continental Road, P.O. Box 609, Warwick, New York
7  10990-0609.

8      Attached hereto as Exhibit 1 is Mr. Anders' expert report.  Among the
9  exhibits appended to that report are Mr. Anders' curriculum vitae (Exhibit A); a list
10  of Mr. Anders' publications and presentations (Exhibit B); and a list of the cases in
11  which Mr. Anders has been deposed or testified as an expert at trial within the past
12  four years (Exhibit C).

13      Graco specifically reserves the right to supplement, augment and amend this
14  expert witness designation and report as provided for under the law, and to call
15  undisclosed rebuttal experts whose identities are presently unknown.  Graco further
16  reserves its right to call all, some or none of the above-referenced experts at the
17  time of trial.

18  Dated:  August 11, 2011              BALLARD SPAHR LLP

19

20

21  Penny M. Costa
    costap@ballardspahr.com
22  **Ballard Spahr LLP**
    2029 Century Park East, Suite 800
23  Los Angeles, California 90067
    Telephone:  (424) 204-4331
24  Facsimile:  (424) 204-4350

25      and

26

27

28

- 2 -

EXPERT WITNESS DISCLOSURE OF GRACO CHILDREN'S PRODUCTS INC.

**Exhibit 1**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LYNN E. RZONCA *(pro hac vice pending)*
rzoncal@ballardspahr.com
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

and

KATRINA M. QUICKER *(admitted pro hac vice)*
quickerk@ballardspahr.com
**Ballard Spahr LLP**
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Facsimile: (678) 420-9301

Attorneys for Plaintiff GRACO CHILDREN'S PRODUCTS INC.

DMEAST #13961732 v2

- 3 -

EXPERT WITNESS DISCLOSURE OF GRACO CHILDREN'S PRODUCTS INC.

**Exhibit 1**
- 18 -

**EXHIBIT** 1

Exhibit 1
- 19 -

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 6:09-bk-34090-CB |
| BABY TREND, INC., | : | |
| Reorganized Debtor. | : | |
| | : | |
| GRACO CHILDREN'S PRODUCTS, INC.,: | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 2:10-CV-05907 JST |
| | : | |
| BABY TREND, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**EXPERT REPORT OF ROBERT JOHN ANDERS, IDSA**

## I.   INTRODUCTION

1.   My name is Robert John Anders.  I am the owner of Robert Anders, A Design
Consultancy in Warwick, N.Y.  My business address is 78 Continental Road, PO Box
609, Warwick, N.Y. 10990-0609.  I have been involved in the industrial design field for
more than fifty years.  I am over 18 years of age and I would otherwise be competent to
testify as to the matters set forth herein if I am called upon to do so at trial, hearing or
deposition.

2.   I have been retained as an industrial design expert witness in this case by Ballard Spahr
LLP, attorneys for the Plaintiff, to opine on design patents in general, and whether the
following accused products, infringe U. S. Patent No. D448,218 (hereinafter the "'218
patent").

2.1.   PY86992  Deluxe - Nursery /Provence;

2.2.   PY86428  Mojito - Deluxe Nursery Center;

2.3.   PY86045  Skylar - Deluxe Nursery Center;

1

**Exhibit 1**
**- 20 -**

2.4.   PY86091  Mesa - Deluxe Nursery Center;

2.5.   PY86443  Columbia - Deluxe Nursery Center;

2.6.   **PY86962 Dakota – Deluxe Nursery Center;**

2.7.   8065BCC  Orange Oak - Deluxe Nursery Center;

2.8.   PY86801  Baby Tech – Deluxe Nursery Center;

2.9.   PY87991  Close N Cozy/Wisteria Lane;

2.10.  PY90918  Twilight – Mini Nursery Center CNC;

2.11.  PY87983  All Star – Deluxe Nursery Center;

2.12.  **PY90973 Cordova - Mini Nursery Center CNC**

2.13.  PY88950  Metropolitan - Deluxe Nursery Center CNC;

2.14.  **PY87029 Gabriella - Deluxe Nursery Center CNC;**

2.15.  PY87965  Chickadee – Deluxe Nursery Center CNC;

2.16.  PY87915  Northridge Plaid – Deluxe Nursery Center CNC;

2.17.  PY87916  Zulu – Deluxe Nursery Center CNC;

2.18.  PY87906  Chrissy – Deluxe Nursery Center CNC;

2.19.  **8274BCC  Deluxe Trend Playard – Havenwood;**

2.20.  8256BCC  Serengetti – Deluxe Nursery Center;

2.21.  8206BCC  Malawi – Deluxe Nursery Center;

2.22.  8207BCC  Sun Dance – Deluxe Nursery Center;

2.23.  8211BCC  Chatham – Deluxe Nursery Center;

2.24.  8263BCC  Zanzibar – Deluxe Nursery Center.

3.     I personally examined the four products in bold above.

4.     I understand that Baby Trend's counsel has confirmed that the four products in bold represent the universe of Baby Trend's playards with curved legs that are at issue in this litigation.

5.     I have had no prior relationship with any of the parties in this case, and my compensation is not dependent upon the outcome of this matter.

6.     My background, education and qualifications are set forth in Section II below and in my *Curriculum Vitae* attached as Exhibit A to this Report.  Section III sets forth an overview and basis of my expert opinions.  Section IV sets my working knowledge of applicable laws.  Section V sets forth my understanding of design patent drawing requirements.

2

**Exhibit 1**
**- 21 -**

Section VI sets forth the language of lines used in design patent drawings.  Section VII sets forth my definition of an ordinary observer for design patent infringement.  Section VIII sets forth my examination of the '218 patent.  Section IX sets forth my infringement analysis methodology.  Section X sets forth my examination of the accused products.  Section XI sets forth my infringement analysis of the accused products.  Section XII contains my conclusions regarding infringement.  Section XIII contains my further remarks.

## II.   BACKGROUND, EDUCATION, AND QUALIFICATIONS

7.   I am a resident of Warwick, New York, and have been an Industrial Designer[1] for more than fifty (50) years, and have experience in both the practical and academic areas of the industrial design field, which is detailed in my Curriculum Vitae attached as Exhibit A.

8.   In August of 2000, I retired as a tenured Professor of Industrial Design from Pratt Institute, one of the largest and most prestigious schools of Art, Design and Architecture in the United States.  I had been a member of the faculty at Pratt since 1988.

9.   Throughout my teaching career, I developed a wide variety of course materials related to industrial design and ergonomics.  I authored nineteen papers that were published and /or presented to professional societies and organizations.  A listing of my publications is contained in Exhibit B.

10.   I was founder and Head of the Design Management Program at Pratt, which was the first and only graduate program in the United States awarding a masters degree in design management.  I also created and was Head of the Graduate Arts & Cultural Management Program at Pratt.  I had previously served as Acting Associate Dean of the School of Art and Design.  In 1995, I was elected by my peers to a three-year term as President of the Academic Senate at Pratt Institute.

11.   I also lectured and/or taught Design at the following institutions:

11.1.   University of Southwestern Louisiana, School of Architecture, Lafayette, Louisiana;

11.2.   Miami University, Miami, Ohio;

---

[1] The discipline of industrial design includes, but is not limited to, product, package, exhibition and display design; ergonomic analysis of human factors conditions; corporate identification, graphics and product branding.  I am skilled in each of these aspects of industrial design.

3

Exhibit 1
- 22 -

11.3.   University of Industrial Arts, Helsinki, Finland;

11.4.   University of Seville, Seville, Spain;

11.5.   University of Essen, Essen, Germany;

11.6.   North Carolina State University;

11.7.   Department of Interior Design, Pratt Institute;

11.8.   High School of Art & Design, Industrial Design Department, New York; and

11.9.   Cooper Hewitt Museum, New York.

12.    During my long career as a designer and teacher of design, I have taught the design of children's products to both undergraduate and graduate industrial design students. I also have designed a number of foldable and collapsible structures employing both rigid metal elements combined with flexible fabric materials.

13.    Additionally, during my career of designing displays and exhibits, I conducted research and evaluated how "ordinary observers" (shoppers and visitors) interacted with numerous product displays. I have spent time understanding how the shoppers and/or visitors viewed my exhibits and displays. As a result of my experience and background, I have developed an understanding of how an ordinary observer views products in the marketplace.

14.    During my entire career, I have acquired knowledge concerning design patents from many sources.

14.1.   My initial exposure to design patents was in my senior Industrial Design undergraduate class titled *Professional Practices* at Pratt Institute, taught by Professor Lee Epstein, Esq. Professor Epstein authored a book widely used by designers titled: *Legal Forms for Designers*.

14.2.   Thirty years later, I was asked to teach the same course at Pratt Institute. Because of the importance of patents, especially design patents to industrial designers, I structured the syllabus to include two sessions by guest lecturer intellectual property attorneys, from whom the students and their teacher learned about design patent law.

14.3.   For the third class session, the Commissioner of the United States Patent and Trademark Office (USPTO), in response to my written request, sent Mr. Wallace R. Burke, A Primary Examiner of Design Patents, to lecture to my students, as

4

**Exhibit 1**
**- 23 -**

well as to me.  During these sessions, Mr. Burke distributed copies of: *Guide for Filing Design Patent Applications, April, 1989.*

14.4.   On October 23, 1996 I attended The National Conference on Industrial Design Protection, sponsored by American Intellectual Property Law Association (AIPLA), the Industrial Designers Society of America (IDSA) and the University of Baltimore, School of Law.  I also obtained a copy and have read *Symposium on Industrial Design Law and Practice*, University of Baltimore Law Review, Volume nineteen, Numbers one/two.

14.5.   Subsequently, I attended a joint meeting of the IDSA and the AIPLA in Washington DC which was devoted to a discussion of design patent law.

14.6.   In 2009, I also attended "Design Day" at the USPTO.

15.   Since 1990, I have served as an Expert Witness in 47 design patent cases.  Clearly, the significant number of design patent cases I have been involved with has been my best teacher.  Although I have extensive experience with design patents, I am not an expert in design patent law, nor am I a lawyer expert, but rather, I am an expert in industrial design only.

16.   Exhibit C provides additional information regarding this work, and lists the cases in which I testified as an expert in industrial design over the past four years.

17.   I am a member of the:

17.1.   Industrial Designers Society of America #19785 (**IDSA**);

17.2.   Human Factors and Ergonomics Society #12595 (**HFES**);

17.3.   National Association of Naval Photography (**NANP**);

17.4.   Materials Information Society #556055 (**ASM**); and the

17.5.   National Fire Protection Association #2464949 (**NFPA**).

18.   As a result of my knowledge, background, education, training and experience, I am skilled in the art of industrial design, including those aspects relating to the design of children's playards.

19.   My time in this matter is billed at a combined rate of $425.00 per hour.  TASA (Technical Advisory Services for Attorneys) is the organization that has referred cases to me since 1990 and handles all administrative and billing matters in cases they refer to me.

5

**Exhibit 1**

**- 24 -**

## III.    OVERVIEW AND BASIS OF MY EXPERT OPINIONS

20.    As set forth herein, the twenty-four accused products infringe the ornamental design for the curved legs of a playard taught by the '218 patent, based on my review of the four representative models.

21.    My expert opinions are based upon my knowledge, background, and experience and my review of the materials listed below:

21.1.    Complaint For Patent Infringement, dated August 6, 2010;

21.2.    Answer and Counterclaims;

21.3.    Reply to Counterclaims;

21.4.    file history of U.S. Patent D448,218;

21.5.    U.S. Patent D448,218 (attached as Exhibit D);

21.6.    prior art cited in the '218 patent and the prior art cited in that prior art;

21.7.    a listing of the actual prior art patents I reviewed is attached as Exhibit E;

21.8.    Declaration of Denny Tsai in Support of Baby Trend, Inc.'s Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, dated July 18, 2011;

21.9.    Declaration of Denny Tsai in Support of Baby Trend, Inc.'s Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment; Memorandum of Points of Authorities [Concurrently filed with Separate Statement of Uncontroverted Facts and Conclusions of Law; Declaration of Denny Tsai; Request for Judicial Notice; [Proposed] Order; and [Proposed] Judgement] dated July 18, 2011;

21.10.    Protective Order, dated March 16, 2011;

21.11.    *Gorham v. White, 81 U.S. 511* (1871);

21.12.    *Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665 (Fed. Cir. 2008) (en banc);

*21.13.    Contessa Food Products, Inc. v. Conagra, Inc.* 282 F.3d 1370 (2002);

21.14.    *Oddzon Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed Cir. 1997);

21.15.    *Crocs, Inc. v. U. S. International Trade Commission,* 598 F.3d 1294, (Fed. Cir. 2010);

21.16.    U.S. Patent D604,970 to Troutman et al., issued Dec. 1, 2009;

6

**Exhibit 1**
**- 25 -**

21.17.  On July 20, 2011, I traveled to the offices of Ballard Spahr at 1735 Market Street, Philadelphia, PA 19103, where I personally examined and photographed four representative accused products.

21.18.  Baby Trend's Production, BT_GCP000001-BT_GCP002041;

21.19.  Graco's Production, GRACO00000001-GRACO00002553;

21.20.  a list of prior art that I examined, attached as Exhibit K;

21.21.  a loose leaf binder containing pages bearing Bates Nos. BT_GCP002042-BT_GCP002069;

21.22.  a loose leaf binder containing pages bearing Bates Nos. BT_GCP002070-BT_GCP002842;

21.23.  letter from Ms. Mallgrave to Ms. Quicker dated August 4, 2011 identifying Baby Trend playards and three models that represent the configurations of all of the accused products; and

21.24.  I also visited the Baby Trend's website where I viewed many of the other models.

## IV.   WORKING KNOWLEDGE OF APPLICABLE LAWS

22.    While I have acquired some working knowledge of the patent laws through classes I have taken, through guest lecturers who taught intellectual property law to my students, through seminars that I have attended, and from having served as an industrial design expert witness during the past twenty years in forty-seven previous cases concerning design patents, I am not an expert in patent law.  In rendering my opinions, I am advised as follows:

22.1.  I understand that for a utility patent to be granted, the claimed invention must have novelty, utility and nonobviousness, while a design patent requires novelty, ornamentality and nonobviousness.

22.2.  I understand that all articles of manufacture have a function.  And that "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."[2]

22.3.  I understand that design patents cover only the novel, ornamental features of a design; they do not cover the functional features of a design.  An ornamental

---

[2] *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed Cir. 1997).

7

Exhibit 1
- 26 -

feature or design has been defined as one which was created for the purpose of ornamenting and cannot be the result or merely a byproduct of functional or mechanical considerations.

22.4.  I understand that the claim in the design patent identifies the patented invention and what is sought to be protected.  All design patents have only one claim, which must refer to the ornamental design for the article, specifying the type of article, which is shown or described in the drawings of the patent.

22.5.  In formulating my opinions and conclusions in this case, I have been provided with an understanding of the prevailing principles of U.S. design patent law that govern the issues of design patent infringement and validity.  I have read and understand the United States Court of Appeals for the Federal Circuit's decision as a result of the en banc hearing of the *Egyptian Goddess, Inc. v. Swisa, Inc.* case, which held that the "test for design patent infringement is whether an ordinary observer, familiar with the prior art, would be deceived into thinking that the accused design was the same as the patented design."

22.6.  I understand that a design patent is infringed when an ordinary observer, familiar with the prior art, would be deceived into thinking that the ornamental aspect of the accused design was the same as the ornamental aspects of the patented design, and infringement will not be found unless the product accused of infringement embodies the ornamental portion of the patented design or an imitation of the patented design.  Imitation of the functional aspects of the design is not infringement of the design patent.

22.7.  As for the "ordinary observer" test, I am informed and understand that the Supreme Court of the United States in 1871 in *Gorham Co. v. White* articulated a test for design patent infringement that is still used today:  "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."  81 U.S. 511, 528 (1871).  In other words, the patentee must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental.

8

**Exhibit 1**
**- 27 -**

23.     Since the ordinary observer test does not require the ornamental features to be identical, but "substantially similar" the question is always raised as to how similar or dissimilar are two designs in order to qualify as being "substantially similar". In my opinion, a reference to the *Gorham v. White* decision is helpful. Depicted below are the three ornamental designs for utensil handles that were the subject of the *Gorham v. White* case. On the left, is the design patented by the Gorham Company in July, 1861. In the center is a design patented by White in 1867 and the design on the right was also patented by White, in 1868. The Court held that the two White patented designs were "substantially similar" to that of the Gorham ornamental design. I believe this visual comparison is helpful in discerning the scope of the meaning of "substantial similarity".



| U.S. Patent | U.S. Patent | U.S Patent |
|-------------|-------------|------------|
| D1,440      | D2,551      | D2,992     |
| to Gorham   | to White    | to White   |

23.1.   Thus, the Supreme Court held that the two White patented designs were substantially similar and infringing. This decision also meant that even though Mr. White had two issued patents, they did not preclude the finding of infringement of his products that had received design patents.

9

Exhibit 1
- 28 -

23.2. Clearly, to be found to be an infringing design, the accused product(s) do not have to be identical in design, but rather must have an overall ornamental appearance that is substantially similar to the patented design. Thus, the Supreme Court established the visual parameters and scope for an ornamental design to infringe a patented design as depicted above.

23.3. The comparison step of the infringement analysis requires a determination of whether the patented design as a whole is substantially similar in appearance to the accused design. The patented and accused designs do not have to be identical in order for design patent infringement to be found. Instead, it is the "visual appearance of a design as a whole, and in particular the visual impression it creates"[3], which is controlling in determining infringement. In fact, there can be no infringement based on the similarity of specific features if the overall appearance of the designs is dissimilar.

24. In another landmark case, *Egyptian Goddess v. Swisa Inc.*, the en banc court of the United States Court of Appeals for the Federal Circuit was quite clear when it wrote, "Instead, in accordance with *Gorham* and subsequent decisions, we hold that the 'ordinary observer' test should be the sole test for determining whether a design patent has been infringed."

24.1. Continuing, the en banc decision added a caveat to the ordinary observer test of *Gorham* by including an aspect of the *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893) case which included knowledge of the prior art, resulting in a modified statement for design patent infringement: "...we hold that the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser **familiar with the prior art** would be deceived by the similarity between the claimed and accused designs, 'inducing him to purchase one supposing it to be the other'". (Emphasis added)

24.2. The en banc ruling in the *Egyptian Goddess* case also determined that "...this court has not required that the trial court attempt to provide a detailed verbal description of the claimed design, as is typically done in the case of utility

---

[3] *Contessa Food Products, Inc. v. Conagra, Inc.* 282 F.3d 1370 (Fed. Cir. 2002)

10

**Exhibit 1**
**- 29 -**

patents". Therefore the claim of the '218 patent is "The ornamental design for curved legs for a playard, as shown and described."

## V.  DRAWING REQUIREMENTS FOR DESIGN PATENTS

25.    Federal Regulations, which I have been told have the force and effect of law, provide specific requirements for design patent drawings, as set forth in "**37 CFR 1.152  Design drawings**".

The design must be represented by a drawing that complies with the requirements of § 1.84 and must contain a sufficient number of views to constitute a complete disclosure of the appearance of the design.  Appropriate and adequate surface shading should be used to show the character or contour of the surfaces represented.  Solid black surface shading is not permitted except when used to represent the color black as well as color contrast.  Broken lines may be used to show visible environmental structure, but may not be used to show hidden planes and surfaces that cannot be seen through opaque materials.  Alternate positions of a design component, illustrated by full and broken lines in the same view are not permitted in a design drawing.  Photographs and ink drawings are not permitted to be combined as formal drawings in one application.  Photographs submitted in lieu of ink drawings in design patent applications must not disclose environmental structure but must be limited to the design claimed for the article.[4]

26.    Similarly, the Manual of Patent Examining Procedure ("MPEP") sets forth guidelines that one of skill in the art would be expected to know and follow:

As the drawing or photograph constitutes the entire visual disclosure of the claim, it is of utmost importance that the drawing or photograph be clear and complete, and that nothing regarding the design sought to be patented is left to conjecture.  When inconsistencies are found among the views, the examiner should object to the drawings and request that the views be made consistent.  *Ex parte Asano*, 201 USPQ 315, 317 (Bd. Pat. App. & Inter. 1978); *Hadco Products, Inc. v. Lighting Corp. of America Inc.*, 312 F. Supp. 1173, 1182, 165 USPQ 496, 503 (E.D. Pa. 1970), vacated on other grounds, 462 F.2d 1265, 174 USPQ 358 (3d Cir. 1972).  When the inconsistencies are of such magnitude that the overall appearance of the design is unclear, the claim should be rejected under 35 U.S.C. 112, first and second paragraphs, as nonenabling and indefinite.  See MPEP § 1504.04, subsection I.A.

27.    MPEP § 1504.02 further explains that:  "The drawing in a design application is incorporated into the claim by use of the claim language 'as shown.'"

**The drawing figures should be appropriately and adequately shaded to show clearly the character and/or contour of all surfaces represented.  See 37 CFR**

---

[4] This language is identical to that found in MPEP § 1503.02.

11

**Exhibit 1**
**- 30 -**

**1.152.  This is of particular importance in the showing of three (3) dimensional articles where it is necessary to delineate plane, concave, convex raised and/or depressed surfaces of the subject matter, and to distinguish between open and closed areas.**

MPEP 1503.02  Surface Shading ¶15.49.

The ornamental design which is being claimed must be shown in solid lines in the drawing.  Dotted lines for the purpose of indicating unimportant or immaterial features of the design are not permitted.  There are no portions of a claimed design which are immaterial or unimportant.

See *In re Blum*, 374 F.2d 904, 153 USPQ 177 (CCPA 1967) and *In re Zahn*, 617 F.2d 261, 204 USPQ 988 (CCPA 1980), MPEP 1503.02 Broken Lines ¶15.49.

28.     Additionally, the MPEP provides detailed guidance to both the public and to Patent Examiners related to compliance with 35 U.S.C. §112 for design patents:

Any analysis for compliance with 35 U.S.C. 112 should begin with a determination of whether the claims satisfy the requirements of the second paragraph before moving on to the first paragraph. *See In re Moore*, 439 F.2d 1232, 169 USPQ 236 (CCPA 1971).  Therefore, before any determination can be made as to whether the disclosure meets the requirements of 35 U.S.C. 112, first paragraph, for enablement, a determination of the scope of protection sought by the claim must be made.  However, since the drawing disclosure and any narrative description in the specification are incorporated into the claim by the use of the language "as shown and described," any determination of the scope of protection sought by the claim is also a determination of the subject matter that must be enabled by the disclosure.  **Hence, if the appearance and shape or configuration of the design for which protection is sought cannot be determined or understood due to an inadequate visual disclosure, then the claim, which incorporates the visual disclosure, fails to particularly point out and distinctly claim the subject matter applicant regards as their invention, in violation of the second paragraph of 35 U.S.C. 112.  Furthermore, such disclosure fails to enable a designer of ordinary skill in the art to make an article having the shape and appearance of the design for which protection is sought.**  In such case, a rejection of the claim under both the first and second paragraphs of 35 U.S.C. 112 would be warranted.

It is prima facie evidence that the scope of the claimed design is limited to those surfaces "as shown" in the application drawing(s) in the absence of any additional written disclosure. *See* MPEP § 1503.01, subsection II. "[T]he adequacy of the disclosure must be determined by reference to the scope asserted." *Philco Corp. v. Admiral Corp.*, 199 F. Supp. 797, 131 USPQ 413, 418 (D. Del. 1961).

12

**Exhibit 1**
**- 31 -**

> However, **it should be understood that when a surface or portion of an article is disclosed in full lines in the drawing it is considered part of the claimed design and its shape and appearance must be clearly and accurately depicted in order to satisfy the requirements of the first and second paragraphs of 35 U.S.C. 112.**

> MPEP § 1504.04 (emphases added)

29.   I am familiar with Patent Office guidelines regarding design patents. These guidelines dictate that "[s]ince there is no detailed specification supporting the disclosure in a design application, it is essential that the drawing be so clear and complete that no portion of the design is left to conjecture. This may require a number of views to constitute a complete disclosure of the appearance of the article. These views must show the claimed design in solid lines, and these views must be consistent in all details of the design, appropriately shaded to show clearly the character and/or contour of the surfaces represented."[5]

30.   Similarly, a later version of the *Guide for Preparation of Patent Drawings* [6] re states the same requirement using slightly different wording. "37 CFR 1.152 The design must be represented by a drawing that complies with the requirements of 1.84 and must contain a sufficient number of views to constitute a complete disclosure of the appearance of the design. Appropriate and adequate surface shading should be used to show the character or contour of the surfaces represented."

31.   "Shading is of particular importance in the showing of three dimensional articles, where it is necessary to delineate plane, concave, convex, raised and/or depressed surfaces of the article, and to distinguish open and solid surfaces. Transparent and translucent surfaces should be indicated by oblique line shading as shown in appendix 4."[7]

32.   Shading is also addressed in 37 C.F.R. § 1.84(m), which relates to all patents, not just design patents:

> The use of shading in views is encouraged if it aids in understanding the invention and if it does not reduce legibility. Shading is used to indicate the surface or shape of spherical, cylindrical, and conical elements of an object. Flat parts may also be lightly shaded. Such shading is preferred in the case of parts shown in

---

[5] *Guide for the Preparation of Patent Drawings*, U.S. Department of Commerce Patent and Trademark Office, October 1993.
[6] *Guide for Preparation of Patent Drawings*, June 2002.
[7] *Guide for Preparation of Patent Drawings*, U.S. Department of Commerce Patent and Trademark Office, October 1993.

Exhibit 1
- 32 -

perspective, but not for cross sections.  See paragraph (h)(3) of this section.
Spaced lines for shading are preferred.  These lines must be thin, as few in
number as practicable, and they must contrast with the rest of the drawings.  As a
substitute for shading, heavy lines on the shade side of objects can be used except
where they superimpose on each other or obscure reference characters. Light
should come from the upper left corner at an angle of 45°.  Surface delineations
should preferably be shown by proper shading.  Solid black shading areas are not
permitted, except when used to represent bar graphs or color.

| VI. | THE LANGUAGE OF LINES USED IN A DESIGN PATENT DRAWING |

33.   Designers communicate their ideas using drawings.  Such drawings employ a vocabulary
      of lines that have definite and specific meanings that are well known within the design
      and manufacturing communities.

34.   On the other hand, the requirements for design patent drawings have developed their own
      vocabulary of lines, which most designers also understand and utilize.  In the following
      table, I define the vocabulary of lines used in design patent drawings.

14

**Exhibit 1**

**- 33 -**

| TABLE 1 | |
|---|---|
| **VOCABULARY OF LINES USED IN DESIGN PATENT DRAWINGS** | |
| ———————— | A continuous thick line used to define the visual edge of a volume claimed in the patent. |
| – – – – – – – | A broken line describes an environmental structure not part of the claimed invention. |
| – – – — – – | A broken line consisting of alternating long and short lines indicates a centerline of a structure. However, "Views must not be connected by projection lines and must not contain center lines."[8] |
| ⫴⫴⫴ | A series of thin lines parallel and equally spaced from each other indicates a flat surface. |
| \| \| \| \| | A series of thin lines parallel to each other with graduated spacing indicates a curved surface. |
| ⫽⫽ | A series of thin lines placed diagonally indicates a transparent surface. |
| ▓▓▓ | Stippling is used for shading to indicate a textured material and/or to indicate a contrast in color and/or material. |
| | The absence of a line indicates no structure or feature is claimed. |

## VII.    THE ORDINARY OBSERVER

35.    I am informed and understand that an "ordinary observer," for purposes of my infringement analysis herein, is the ordinary purchaser or one who may purchase and use the playard and who had acquired some knowledge of prior art playards previously.

## VIII.    EXAMINATION OF U.S. PATENT D448,218 (THE '218 PATENT)

36.    I now examine and analyze the '218 patent.

37.    The title of the patent is "Curved Legs for a Playard"

---

[8] 37 CFR 1.84 (h).

15

**Exhibit 1**
**- 34 -**

38. The claim of the '218 patent is for: "The ornamental design for curved legs for a playard, as shown and described."

39. In Table 2 below, I reproduced the seven figures disclosing the patented design found in the '218 patent.

| **TABLE 2**<br>**U.S. Patent D448,218**<br>**CURVED LEGS FOR A PLAYARD** | |
|---|---|
|  | Fig.1 is a perspective view of curved legs for a playard.<br><br>I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.<br>Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design. |

16

Exhibit 1
- 35 -



Fig. 2 is a front elevation view.

I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.
Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design.

Fig. 3 is a back elevation view.

I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.
Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design.

17

**Exhibit 1**



Fig. 4 is a right-side elevation view.

I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.
Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design.

Fig. 5 is a left-side elevation view.

I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.
Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design.

18

Exhibit 1
- 37 -



| | Fig. 6 is a top plan view.<br><br>I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.<br>Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design. |
| --- | --- |
| | Fig. 7 is a bottom plan view.<br><br>I note that the drawing utilizes only solid, heavy weighted lines to define the legs of the playard, and use appropriate shading lines to indicate the curve of the legs.<br>Thus, all of the remainder of the environmental structure is not claimed and may not be considered as part of the claimed design. |

40. The patent thus claims:

    40.1.   four narrow legs positioned and projecting outwardly from the corners of a playard;

    40.2.   the major length of each leg is cylindrical and a convex curve that bows outwardly; and

    40.3.   the top of each leg has a slight ogee curvature.

41. I understand that all of "the features shown in broken lines are for illustrative purposes only and do not form part of the claimed design."

19

**Exhibit 1**
**- 38 -**

## IX.   MY INFRINGEMENT ANALYSIS METHODOLOGY

42.   I understand that an infringement analysis consists of the "ordinary observer" test.  The Supreme Court of the United States in 1871 in *Gorham Co. v. White* articulated a test for design patent infringement that is still used today: "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

43.   Additionally, I understand having served as a design expert in *Contessa Food Products, Inc. v. Conagra, Inc.* 282 F.3d 1370 (Fed. Cir. 2002) that one must examine all of the Figures of the patent.

44.   Furthermore, I understand that the en banc decision of the U. S. Court of Appeals for the Federal Circuit in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc) modified the hypothetical ordinary observer test found in Gorham to include one "who is conversant with the prior art".

45.   As a result of my understanding of the requirements for an infringement analysis, my methodology has three parts:

45.1.   first, to photographically document the representative accused products from the same view points taught by the patented design;

45.2.   secondly, to conduct a search of the prior art to find a design that has the closest overall ornamental appearance as disclosed in the patented design; and

45.3.   thirdly, to assemble a visual presentation combining the above two components with the ornamental design taught by the patented design, to assist the trier of fact in this matter.

46.   I now undertake a detailed visual comparative analysis of whether an ordinary observer, with knowledge of the prior art, would mistake the accused product(s) for the patented ornamental design of curved legs for a playard.

47.   My photographs of these products were taken from the same views (perspective, top, bottom, rear side, left side, front end, and rear end views) as contained in the patent for the three embodiments depicted.  However, I am aware that a photograph of a three dimensional product built from technical two dimensional orthogonal drawings (such as those used both in manufacturing and in United States patent drawings) will not translate

20

**Exhibit 1**
**- 39 -**

into an exact replication of a drawing produced by this methodology, since orthogonal drawings assume the viewer is at infinity and the lines of sight are parallel to each other and perpendicular to the plane of projection, while a photographic image is obtained from a close proximity using one point perspective.

48. These limitations notwithstanding, I believe the photographs are a good indicator of the ornamental design elements found in the patent drawings.

49. While this Expert Report includes multiple thumbnail photographs of the accused product, I have attached as Exhibits to this report, larger images of the photographs and drawings contained within the body of this report, to assist the Court in comparing the ornamental design disclosed in the patent drawings with the photographic images of the accused product(s).

50. To find the prior art example that is visually the closest in the overall appearance taught by the '218 patent, I reviewed over 1200 patents. From this large number, I narrowed the potential designs down to the five (5) depicted below in Table 3.

| TABLE 3 | | |
|---|---|---|
| **POTENTIAL PRIOR ART DESIGNS HAVING SIMILARITIES TO THE '218 PATENTED DESIGN** | | |
|  Fig. 1 | U.S. Patent D323,589 to Mariol, issued Feb. 4,1992. | This design for a foldable playpen or similar item has the same relative overall proportions of the '218 patent, and has a convex curvature on the top end rail while the legs are straight.  (For enlargement of this thumbnail image, see Exhibit E.1.) |
|  Fig. 1 | U. S. Patent D366,778 to Pollard, issued Feb.6, 1996. | This design for a crib has the same relative overall proportions of the '218 patent, and has ogee shaped legs that are planar, not cylindrical. (For enlargement of this thumbnail image, see Exhibit E.2.) |

21

Exhibit 1
- 40 -

|   Fig. 1 | U. S. Patent D397,882 to Wu, issued Sep. 8, 1998. | This design for a collapsible baby bed has the same relative overall proportions of the '218 patent, and has straight cylindrical legs. (For enlargement of this thumbnail image, see Exhibit E.3.) |
|---|---|---|
|   Fig. 1 | U. S. Patent D409,420 to Walters-Dowding et al., issued May 11, 1999. | This patent for a table base has the same relative overall proportions of the '218 patent, and has cylindrical legs that bow outwards, and which terminate as a scroll. (For enlargement of this thumbnail image, see Exhibit E.4.) |
|   Fig. 1 | U.S. Patent D411,386 to Horn, issued Jun. 22, 1999. | This design for a cot/crib has the same relative overall proportions of the '218 patent, and has ogee shaped legs that are planar, not cylindrical. (For enlargement of this thumbnail image, see Exhibit E.5.) |

51.   From these prior art examples, I determined that the closest example of prior art to the design claimed in the '218 patent was U.S. Patent D323,589 to Mariol, issued Feb. 4,1992, (hereinafter the "'589 patent").  Accordingly, in Table 4 below, I compare each figure of the claimed design with the relative figures of the nearest prior art example.

22

**Exhibit 1**
**- 41 -**



| **TABLE 4** | | |
| **COMPARISON OF THE NEAREST PRIOR ART WITH THE DESIGN CLAIMED IN THE '218 PATENT** | | |
| U. S. Patent D448, 218 | U.S. Patent D323,589 | Comments |
| Fig. 1 Perspective View | Fig. 1 Perspective View | The '589 design has similar overall proportions as claimed in the '218 patent, yet has straight cylindrical legs and convex curved top rails instead of convexly curved cylindrical legs as claimed, in the '218 patented design.  (For enlargement of these thumbnail images, see Exhibit F.1.) |
| Fig. 2 Front Elevational View | Fig. 2 Left Side Elevational View | The '589 design has similar overall proportions as claimed in the '218 patent, yet has straight cylindrical legs instead of convexly curved cylindrical legs as claimed, in the '218 patented design.  (For enlargement of these thumbnail images, see Exhibit F.2.) |
| Fig. 3 Back Elevational View | Mirror Image of Fig. 2 | The '589 design has similar overall proportions as claimed in the '218 patent, yet has straight cylindrical legs instead of convexly curved cylindrical legs as claimed, in the '218 patented design.  (For enlargement of these thumbnail images, see Exhibit F.3.) |

23

**Exhibit 1**
**- 42 -**



| | | |
|---|---|---|
| Fig. 4<br>Right Side Elevational View | Fig. 3<br>End Elevational View | The '589 design has similar overall proportions as claimed in the '218 patent, yet has straight cylindrical legs and convex curved top rails instead of convexly curved cylindrical legs as claimed, in the '218 patented design. (For enlargement of these thumbnail images, see Exhibit F.4.) |
| Fig. 5<br>Left Side Elevational View | Mirror Image of Fig. 3 | The '589 design has similar overall proportions as claimed in the '218 patent, yet has straight cylindrical legs and convex curved top rails instead of convexly curved cylindrical legs as claimed, in the '218 patented design. (For enlargement of these thumbnail images, see Exhibit F.5.) |
| Fig. 6<br>Top Plan View | Fig. 4<br>Top Plan View | The '589 design has similar overall proportions as claimed in the '218 patent. (For enlargement of these thumbnail images, see Exhibit F.6.) |
| Fig. 7<br>Bottom Plan View | Fig. 5<br>Bottom Plan View | The '589 design has similar overall proportions as claimed in the '218 patent. The cylindrical legs appear to be hollow in the '589 design instead of solid as depicted in the '218 patent. (For enlargement of these thumbnail images, see Exhibit F.7.) |

24

Exhibit 1
- 43 -

## X.    MY EXAMINATION OF THE ACCUSED PRODUCTS

52.    I analyzed and photographed four representative accused products produced by the Defendant.  These products are identified and depicted below in Table 5.  I noted that I did not assess them with all of the "bells and whistles" in place because they are superfluous and extraneous.



| TABLE 5 |
|---|
| **THE FOUR ACCUSED PRODUCTS I EXAMINED** |

| | Perspective view of PY90973<br>Mini Playard - Cordova |
|---|---|
| | Perspective view of PY87029<br>Deluxe Trend Playard - Gabriella |

25

Exhibit 1
- 44 -



| | |
|---|---|
| | Perspective view of PY86962<br>Deluxe Trend Playard - Dakota |
| | Perspective view of 8274BCC<br>Deluxe Trend Playard – Havenwood |

53.   It is readily apparent that all four accused products are based on the same design and vary only in coloration and pattern in limited portions, yet provide the same overall appearance to each other.

## XI.   MY INFRINGEMENT ANALYSIS OF THE ACCUSED PRODUCTS

54.   In the four tables below, I make a three way comparative visual analysis of the accused product(s) with each view of the patented design and the closest example of prior art that I was able to locate, the '589 patent.

55.   Additionally, I understand that during a design patent infringement analysis, one is to disregard any branding labels that may be affixed to the accused products.

56.   In Table 6, I compare the overall appearance of the PY90973 Mini Playard – Cordova, with both the relative views of the '218 patent and that of the nearest prior art, the '589 patent.

26

**Exhibit 1**
**- 45 -**



**TABLE 6**

**INFRINGEMENT ANALYSIS OF THE ACCUSED PY90973 PRODUCT**

**MINI PLAYARD – CORDOVA**

| U. S. Patent D448, 218 | The Accused PY90973 Product Mini Playard – Cordova | Relevant Prior Art U.S. Patent D323,589 |
|---|---|---|
| Fig. 1 Perspective View | Perspective View | Fig. 1 Perspective View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit G.1) | | |
| Fig. 2 Front Elevational View | Front Elevational View | Fig. 2 Left Side Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit G.2) | | |

27

**Exhibit 1**

**- 46 -**



| Fig. 3<br>Back Elevational View | Back Elevational View | Mirror Image of Fig. 2 |
|---|---|---|
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit G.3) | | |
| Fig. 4<br>Right Side Elevational View | Right Side Elevational View | Fig. 3<br>End Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit G.4) | | |
| Fig. 5<br>Left Side Elevational View | Left Side Elevational View | Mirror Image of Fig. 3 |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit G.5) | | |

28

**Exhibit 1**
**- 47 -**



| | | |
|---|---|---|
| Fig. 6<br>Top Plan View | Top Plan View | Fig. 4<br>Top Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit G.6)

| | | |
|---|---|---|
| Fig. 7<br>Bottom Plan View | Bottom Plan View | Fig. 5<br>Bottom Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit G.7)

57.  Based on at least the foregoing substantial similarities between the patented design and the accused PY90973 product, an ordinary observer with knowledge of the prior art, giving such attention as a purchaser usually gives, would be induced to purchase the accused playard supposing it to be the patented playard.

58.  Since the design of the accused product is closer to the '218 patented design than the closest prior art example, the '589 patent, the accused product infringes the '218 patent.

59.  In Table 7, I compare the overall appearance of the accused PY87029 product Deluxe Trend Playard – Gabriella, with both the relative views of the '218 patent and that of the nearest prior art, the '589 patent.

29

**Exhibit 1**<br>**- 48 -**



**TABLE 7**

**INFRINGEMENT ANALYSIS OF THE ACCUSED PY87029 PRODUCT DELUXE TREND PLAYARD - GABRIELLA**

| U. S. Patent D448, 218 | The Accused PY87029 Product Deluxe Trend Playard - Gabriella | Relevant Prior Art U.S. Patent D323,589 |
|---|---|---|
| Fig. 1 Perspective View | Perspective View | Fig. 1 Perspective View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit H.1) | | |
| Fig. 2 Front Elevational View | Front Elevational View | Fig. 2 Left Side Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit H.2) | | |

30

Exhibit 1
- 49 -



| Fig. 3 Back Elevational View | Back Elevational View | Mirror Image of Fig. 2 |
| --- | --- | --- |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit H.3) | | |
| Fig. 4 Right Side Elevational View | Right Side Elevational View | Fig. 3 End Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit H.4) | | |
| Fig. 5 Left Side Elevational View | Left Side Elevational View | Mirror Image of Fig. 3 |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit H.5) | | |

31

**Exhibit 1**



| | | |
|---|---|---|
| Fig. 6<br>Top Plan View | Top Plan View | Fig. 4<br>Top Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit H.6)

| | | |
|---|---|---|
| Fig. 7<br>Bottom Plan View | Bottom Plan View | Fig. 5<br>Bottom Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit H.7)

60.  Based on at least the foregoing substantial similarities between the patented design and the accused PY87029 product, an ordinary observer with knowledge of the prior art, giving such attention as a purchaser usually gives, would be induced to purchase the accused playard supposing it to be the patented playard.

61.  Since the design of the accused product is closer to the '218 patented design than the closest prior art example, the '589 patent, the accused product infringes the '218 patent.

62.  In Table 8, I compare the overall appearance of the accused PY86962 product, Deluxe Trend Playard - Dakota, with both the relative views of the '218 patent and that of the nearest prior art, the '589 patent.

32

Exhibit 1
- 51 -



**TABLE 8**

**INFRINGEMENT ANALYSIS OF THE ACCUSED PY86962 PRODUCT**

**DELUXE TREND PLAYARD - DAKOTA**

| U. S. Patent D448, 218 | The Accused PY86962 Product Deluxe Trend Playard - Dakota | Relevant Prior Art U.S. Patent D323,589 |
|---|---|---|
| Fig. 1 Perspective View | Perspective View | Fig. 1 Perspective View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit I.1)

| | | |
|---|---|---|
| Fig. 2 Front Elevational View | Front Elevational View | Fig. 2 Left Side Elevational View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit I.2)

33

Exhibit 1
- 52 -



| | | |
|---|---|---|
| Fig. 3<br>Back Elevational View | Back Elevational View | Mirror Image of Fig. 2 |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit I.3)

| | | |
|---|---|---|
| Fig. 4<br>Right Side Elevational View | Right Side Elevational View | Fig. 3<br>End Elevational View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit I.4)

| | | |
|---|---|---|
| Fig. 5<br>Left Side Elevational View | Left Side Elevational View | Mirror Image of Fig. 3 |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit I.5)

34

**Exhibit 1**
**- 53 -**



| Fig. 6<br>Top Plan View | Top Plan View | Fig. 4<br>Top Plan View |
|---|---|---|

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit K.6)

| Fig. 7<br>Bottom Plan View | Bottom Plan View | Fig. 5<br>Bottom Plan View |
|---|---|---|

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit I.7)

63.  Based on at least the foregoing substantial similarities between the patented design and the accused PY86962 product, an ordinary observer with knowledge of the prior art, giving such attention as a purchaser usually gives, would be induced to purchase the accused playard supposing it to be the patented playard.

64.  Since the design of the accused product is closer to the '218 patented design than the closest prior art example, the '589 patent, the accused product infringes the '218 patent.

65.  In Table 9, I compare the overall appearance of the accused 8274BCC product, Deluxe Trend Playard – Havenwood, with both the relative views of the '218 patent and that of the nearest prior art, the '589 patent.

35

Exhibit 1
- 54 -



| TABLE 9 | | |
|---|---|---|
| **INFRINGEMENT ANALYSIS OF THE ACCUSED 8274BCC PRODUCT** | | |
| **DELUXE TREND PLAYARD – HAVENWOOD** | | |
| U. S. Patent D448, 218 | The Accused 8274BCC Product Deluxe Trend Playard – Havenwood | Relevant Prior Art U.S. Patent D323,589 |
| Fig. 1 Perspective View | Perspective View | Fig. 1 Perspective View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit J.1) | | |
| Fig. 2 Front Elevational View | Front Elevational View | Fig. 2 Left Side Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit J.2) | | |

36

Exhibit 1
- 55 -



| Fig. 3 Back Elevational View | Back Elevational View | Mirror Image of Fig. 2 |
| --- | --- | --- |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these three figures, see Exhibit J.3) | | |
| Fig. 4 Right Side Elevational View | Right Side Elevational View | Fig. 3 End Elevational View |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit J.4) | | |
| Fig. 5 Left Side Elevational View | Left Side Elevational View | Mirror Image of Fig. 3 |
| In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit J.5) | | |

37

**Exhibit 1**
**- 56 -**



| | | |
|---|---|---|
| Fig. 6<br>Top Plan View | Top Plan View | Fig. 4<br>Top Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit K.6)

| | | |
|---|---|---|
| Fig. 7<br>Bottom Plan View | Bottom Plan View | Fig. 5<br>Bottom Plan View |

In this view, the overall ornamental appearance of the accused product is substantially more similar to the '218 patented design than it is to the nearest prior art design of the '589 patent. (For an enlarged comparison of these two figures, see Exhibit J.7)

66. Based on at least the foregoing substantial similarities between the patented design and the accused 8274BCC product, an ordinary observer with knowledge of the prior art, giving such attention as a purchaser usually gives, would be induced to purchase the accused playard supposing it to be the patented playard.

67. Since the design of the accused product is closer to the '218 patented design than the closest prior art example, the '589 patent, the accused product infringes the '218 patent.

**XII.   MY CONCLUSIONS REGARDING INFRINGEMENT**

68. It is my opinion, that all four products I examined, when viewed by an ordinary observer with knowledge of the prior art, would find that the overall appearance, and the visual impression they make, would be substantially the same as the ornamental design disclosed in the '218 patent.

38

**Exhibit 1**
**- 57 -**

69.     After reviewing all of the evidence listed in the Table of Contents to this report, and my detailed examination of the patent and the four representative accused products, I can only arrive at the following conclusions:

69.1.   The accused PY90973 product, Mini Playard – Cordova, infringes the design claimed in the '218 patent because the overall appearance is substantially the same as disclosed by the patent.

69.2.   The accused PY87029 product, Deluxe Trend Playard - Gabriella, infringes the design claimed in the '218 patent because the overall appearance is substantially the same as disclosed by the patent.

69.3.   The accused PY86962 product, Mini Playard with Deluxe Trend Playard - Dakota, infringes the design claimed in the '218 patent because the overall appearance is substantially the same as disclosed by the patent.

69.4.   The accused 8274BCC product, Deluxe Trend Playard – Havenwood, infringes the design claimed in the '218 patent because the overall appearance is substantially the same as disclosed by the patent.

69.5.   The other products all infringe because they have the same configuration as the representative models.

## XIII.  REMARKS

70.     I currently hold the opinions expressed in this Expert Report.  As my study of the case continues, I may acquire additional information and/or attain supplemental insights that that result in added observations.  I reserve the right to supplement this Expert Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial.  Nevertheless, I believe that the information before me to date supports the opinions expressed in this document.  I also reserve the right to rely on all other declarations and expert reports submitted in this litigation.

71.     Furthermore, I may also be called upon to provide expert analysis and opinions in rebuttal to any proofs brought forward by the Defendant in this litigation.  To the extent additional information is provided, I intend to address it and, if appropriate, submit a rebuttal report.

72.     During my testimony at trial, hearing or deposition, I expect to rely upon exhibits prepared to depict and explain the information contained in this Expert Report or as

39

**Exhibit 1**
**- 58 -**

rebuttal to testimony by the Defendant's witnesses.  Any such exhibits will be prepared and identified at the appropriate time.

73.   I HEREBY DECLARE under penalty of perjury that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine and imprisonment, or both, under 18 U.S.C. §1001.

Respectfully submitted,

Dated: August _10_, 2011

Robert John Anders

40

**Exhibit 1**

**- 59 -**

**Expert Report of Robert John Anders**                    **TABLE OF CONTENTS**

A.    Curriculum Vitae

B.    Publications and Papers Presented to Professional Societies, Organizations and Companies

C.    Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years

D.    U.S. Patent D448,218

E.    Enlargements of Thumbnails in Table 3

F.    Enlargements of Thumbnails in Table 4

G.    Enlargements of Thumbnails in Table 6

H.    Enlargements of Thumbnails in Table 7

I.    Enlargements of Thumbnails in Table 8

J.    Enlargements of Thumbnails in Table 9

K.    List of Prior Art I Examined

**Exhibit 1**

**- 60 -**

**EXHIBIT  A**

**Exhibit 1**
**- 61 -**

**Expert Report of Robert John Anders**                                    **Exhibit A.1**

| | | | |
|---|---|---|---|
| **Curriculum Vitae:** | **Robert John Anders**<br>78 Continental Road<br>PO Box 609<br>Warwick, N. Y. 10990-0609 | Voice:<br>Fax:<br>Cell:<br>email: | 845-987-8674<br>845-987-8675<br>845-987-6534<br>rjanders@msn.com |

| | | |
|---|---|---|
| **EMPLOYMENT:** | **Robert Anders, A Design Consultancy**<br>P. O. Box 609<br>Warwick, N.Y., 10990-0609 | Owner of consultancy<br>involved with industrial<br>design. |
| **Professor** | **Pratt Institute**<br>Department of Industrial Design<br>Brooklyn, N.Y. graduate programs: | Taught undergraduate and<br>graduate courses, Created new<br>"Design Management" and "Arts &<br>Cultural Management" |
| **Acting Associate Dean** | School of Art & Design<br>Pratt Institute | Responsible for financial and<br>administrative management<br>systems. |
| **Deputy Commissioner<br>General** | **United States Exhibition,  Expo '88**<br>Brisbane, Australia<br>U.S.I.A., Washington, D.C., | Responsible for project direction<br>and overall management of the<br>$8.5mm exhibition |
| **Chief, Exhibitions<br>Management Division** | **Pennsylvania Historical & Museum**<br>Commission, P. O. Box 1026<br>Harrisburg, PA., 17108-1026 | Responsible for the design<br>fabrication and maintenance of<br>exhibits at all 27 museums and<br>historical sites in Pennsylvania. |
| **Vice President**<br><br>**President,** | **Barry Howard & Associates, Inc.**<br>Larchmont, N.Y.<br>**Interpretive Media, Ltd.**<br>Orleans, LA. | Principal responsible for project<br>design and management at the<br>parent firm and for the New<br>Creative direction and management<br>of this audiovisual subsidiary. |
| **Vice President** | **PHP International, Inc.**<br>Harrison N.Y. | Principal responsible for<br>exhibit and graphic design;<br>field supervision. |
| **Director,<br>Visual Merchandising** | **Revlon, Inc.**<br>767 Fifth Avenue<br>New York, N.Y., 10022 | Department head responsible<br>for design and management<br>of all displays at consumer<br>point of purchase. |
| **President** | **The Anders Group, Inc.**<br>Staten Island, N.Y. | Owner of a firm involved with<br>the general practice of<br>industrial design. |
| **Director, Staff Design** | **Bristol-Myers Company**<br>345 Park Avenue<br>New York, N.Y., 10022 | Established and managed a<br>department of seventeen which<br>provided a wide variety of<br>industrial design services to |

**Exhibit 1**
**- 62 -**

the corporate staff and divisions.

**Expert Report of Robert John Anders**                                    **Exhibit A.2**

| President | **Robert Anders Design, Inc.**<br>342 Madison Avenue<br>New York, N.Y., 10017 | Owner of an industrial design firm with a staff of 22 concerned with exhibition, graphic, audio-visual, museum, interior, product and furniture design. |
| Assistant Director | Exhibition Design Department<br>Donald Deskey Associates, Inc.<br>New York, N.Y. | Responsible for creative super-vision and project administration of up to thirty-eight designers creating major exhibitions. |
| Director of Industrial Design | Arthur Wagner Associates, Inc.<br>New York, N.Y. | Supervised all industrial design and architectural projects for this thirteen person office. |
| Exhibition & Architectural Design Specialist | Office of International Trade Fairs<br>U.S. Department of Commerce<br>Washington, D.C. | Project designer of United States Exhibitions at international trade fairs abroad. |

| EDUCATION: | B.I.D. (Bachelor of Industrial Design)<br>Department of Industrial Design<br>Pratt Institute, Brooklyn, N.Y. | U.S. Naval Schools:<br>Aerial Photography, Pensacola, FL<br>Deep Sea Divers, San Diego, CA |

AWARDS & HONORS:

First prize in package design, National Paper Box Association
Pratt Institute Alumni; " Contemporary Achievement Award"
"Dean's Medal", Department of Industrial Design, Pratt Institute

SOCIETIES:

**IDSA** (Industrial Designers Society of America)
**HF&ES** (Human Factors and Ergonomics Society)
**NANP** (National Association of Naval Photography)
**NFPA** (National Fire Protection Association
**ASM International** (Materials Information Society

**Exhibit 1**

**EXHIBIT B**

**Exhibit 1**
**- 64 -**

**Expert Report of Robert John Anders**                                    **Exhibit B.1**

**Publications and Papers Presented to Professional Societies, Organizations and Companies**

*CAUTION! CAD drawings may be fatal to your design patent.* Article published online at TASAnet.com. Summer, 2010.

*At what point in time should an industrial design expert be retained in a lawsuit?* Article published online at Experts.com website. Winter, 2009.

*Defining, Mapping and Designing the Design Process.* Article published in the Design Management Journal, Volume 11, Number 3, Summer 2000.

*Design In Today's Corporate Culture.* Guest Editor and author of article in <u>Innovation</u>, the quarterly journal of the Industrial Designers Society of America, Spring, 1999.

*The Design Management Program (DMP) at Pratt Institute.* Article published in <u>Design Management Journal</u>, Vol. 9, Number 2, Spring 1998.

*Universal Design in the Industrial Design Department at Pratt Institute.* Article published in <u>Innovation</u>, the quarterly journal of the Industrial Designers Society of America, Spring, 1997.

*Design Management… for Designers? An outrageous idea whose time has come.* Article prepared for <u>Innovation</u>, the quarterly journal of the Industrial Designers Society of America, Fall, 1996.

*Fostering Strategic New Design Cultures.* Paper presented at the 8th International Forum on Design Management Research & Education, at IESE Universidad De Navarra, Barcelona, Spain. November 20-22, 1996.

*Universal Design for Hand Held Products.* Paper Presented to Universal Design Education Project, Boston, Massachusetts. 1994.

*Universal Design.* Keynote Speech, Universal Design Education Project, Miami University, Miami, Ohio. 1994.

*Universal Design.* Talk prepared for the Display, Design & Fixture Design Show. Chicago Hilton & Towers, May 26, 1994. (Also Published by Adaptive Environments on the Internet, 1995.)

*Universal Design.* Graduate Course at the University of Industrial Arts, Helsinki, Finland. 1993.

**Exhibit 1**
**- 65 -**

*Universal Design, Pratt Institute Design Primers.* Book, co-author with Daniel M. Fechtner, M.D., under a grant received from the J.M. Foundation. Published by Pratt Institute Department of Industrial Design & Pratt Center for Advanced Design Research. 1993. Sold nationally by the IDSA.

*Universal Design Curriculum.* Book, co-author, with Daniel M. Fechtner, M.D., Grant received from the J.M. Foundation. Published by Pratt Center for Advanced Design Research. 1992. Sold nationally by the IDSA.

*Expo '92.* Seminar for faculty and students, Department of Industrial Design, University of Essen; Essen, Germany. 1992.

*Universal Design from an Industrial Design Perspective.* Paper presented at Colloquium for the Universal Design Education Project, North Carolina State University. 1992.

*Universal Design Curriculum Development* Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992

*Making Sense of a Spectrum of Users From Two Divergent Disciplines.* Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992

*Universal Design Career Day for High School Students.* (at the Cooper Hewitt National Museum of Design). Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992.

*Is It Fair* Metropolis, magazine, November, 1992, p.57.

CATIA® (Computer Aided Three-dimensional Interactive Application) User Manual for Industrial Designers. *Co-author, with Clarence Feng and Alexander W.S. Tam. Written under research agreement No. 8093 with IBM. Published by Pratt Institute, Brooklyn, New York. 1990*

**Exhibit 1**
**- 66 -**

EXHIBIT  C

**Exhibit 1**

**Expert Report of Robert John Anders**                                    **Exhibit C.1**

*Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years*

| Case | Court | Type of Testimony |
|------|-------|-------------------|
| Daniel J. Cavanagh, v. [Sunbelt Materials Handling, Inc.] Index No.: 03-3377 | Supreme Court of the State of New York County of Ulster | Trial |
| Lusa Lighting Intl., Inc., v. [American Elex, Inc.]. SACV 07-674 DOC (MLGx) | United States District Court Central District of California | Deposition |
| [Dexas International, Ltd.,] v. Saunders Mfg. Co., Inc., Civil Action No. 3-07CV-0296L | United States District Court Northern District of Texas Dallas Division | Deposition |
| [Ashley Furniture Industries, Inc.] v. Lifestyle Enterprise, Inc., Civil File No. 07-C-0230-C | United States District Court Western District of Wisconsin | Deposition |
| HR US LLC v. [Mizco International, Inc., and Albert Mizrahi.] Civil Action No.: CV 07-2394 (ERK) (JO) | United States District Court Eastern District of New York Brooklyn Division | Deposition |
| [Simpson Ventures, Inc.] v. Mid-West Metal Products Company, Inc. Civil Action No.: 3:07-cv-00048-WHA-CSC | United States District Court Middle District of Alabama Eastern Division | Deposition |

**Exhibit 1**

**- 68 -**

**Expert Report of Robert John Anders**                               **Exhibit C.2**

*Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years*

| Case | Court | Type of Testimony |
|---|---|---|
| [Alliance Packaging, LLC] v. Smurfit-Stone Container Corporation, and Altivity Packaging LLC. NO. CV07-112-TSZ | United States District Court Western District of Washington at Seattle | Deposition |
| [Slaughter] v. Conway's Department Store Docket No. ESX-L-3799-07 | Superior Court of New Jersey Essex County, Newark, New Jersey | Deposition |
| [Accuride International, Inc.] v. SSW Holding Company, Inc. and American Appliance Products, Inc. No. CV-09-3377-PA (PJWx) | United States District Court Central District of California Western Division | Deposition |
| [Amanda Hartzog] v. United Corporation d/b/a Plaza Extra Civil No. 95/2004 | In The Territorial Court of the Virgin Islands Division of St. Croix | Deposition |
| Arthur Campbell v. PEH1 and [Eclectic Furniture] CV-07-5011580s | In the Superior Court State of Connecticut Judicial District of Hartford | Deposition, Trial |

**Exhibit 1**
**- 69 -**

**Expert Report of Robert John Anders**                                   **Exhibit C.3**

*Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years*

| Case | Court | Type of Testimony |
|---|---|---|
| Havis Glover, et al.<br>v.<br>Wade, Inc., et al.<br>No. 2010-0013cigf | In the Circuit Court of Leflore County Mississippi | Deposition, Trial |

**Exhibit 1**<br>- 70 -

EXHIBIT  D

Exhibit 1
- 71 -

Expert Report of Robert John Anders                          Exhibit D

U.S. Patent D448,218

**Exhibit 1**
**- 72 -**

US00D448218B1

(12) **United States Design Patent**    (10) Patent No.:      **US D448,218 S**
Celestina-Krevh                         (45) Date of Patent:   \*\*   **Sep. 25, 2001**

(54) **CURVED LEGS FOR A PLAYARD**

(75) Inventor:   **Mary Ann Celestina-Krevh**, Euclid, OH (US)

(73) Assignee:   **Graco Children's Products Inc.**, Elverson, PA (US)

(\*\*) Term:   **14 Years**

(21) Appl. No.:   **29/122,855**

(22) Filed:   **May 5, 2000**

(51) LOC (7) Cl. .................................. **06-06**

(52) U.S. Cl. ................. **D6/495; D6/331; D6/503; D6/499**

(58) Field of Search .................. D6/382, 385, 388–395, D6/331; 5/907, 93.1, 93.2, 98.1, 101, 99.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| D. 397,882 | \* | 9/1998 | Wu | ............................ | D6/391 |
| 4,376,318 | \* | 3/1983 | Cirillo | ............................ | 5/99.1 |

| 5,349,709 | \* | 9/1994 | Cheng | ............................ | 5/93.1 |
| 5,367,725 | \* | 11/1994 | Tsai | ............................ | 5/99.1 |

\* cited by examiner

*Primary Examiner*—Janice E. Seeger
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57)   **CLAIM**

The ornamental design for curved legs for a playard, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of curved legs for a playard showing my new design;
FIG. 2 is a front elevation view thereof;
FIG. 3 is a back elevation view thereof;
FIG. 4 is a right-side elevation view thereof;
FIG. 5 is a left-side elevation view thereof;
FIG. 6 is a top plan view thereof; and,
FIG. 7 is a bottom plan view thereof.
The features shown in broken lines are for illustrative purposes only and do not form part of the claimed design.

**1 Claim, 7 Drawing Sheets**



**Exhibit 1**
- 73 -



FIG. 1

Exhibit 1
- 74 -

Case 2:10-cv-05897-JLS-MLG   Document 101   Filed 10/31/11   Page 81 of 167   Page ID
#:4139



FIG. 2

Exhibit 1
- 75 -



FIG. 3

Exhibit 1
- 76 -

**U.S. Patent**      Sep. 25, 2001      Sheet 4 of 7      US D448,218 S

# FIG. 4



Exhibit 1
- 77 -

# FIG. 5



Exhibit 1
- 78 -



FIG.6

Exhibit 1
- 79 -

FIG. 7

Exhibit 1
- 80 -

**EXHIBIT  E**

Exhibit 1
- 81 -

Expert Report of Robert John Anders                                    Exhibit E

Enlargements of Thumbnails in Table 3

Exhibit 1
- 82 -

Expert Report of Robert John Anders                                    Exhibit E.1



Fig. 1

U.S. Patent D323,589 to Mariol, issued Feb. 4,1992

Exhibit 1

- 83 -



Fig. 1

U. S. Patent D366,778 to Pollard, issued Feb.6, 1996.

Exhibit 1
- 84 -



Fig. 1

U. S. Patent D397,882 to Wu, issued Sep. 8, 1998.

Exhibit 1

- 85 -



Fig. 1

U. S. Patent D409,420 to Walters-Dowding et al., issued May 11, 1999.

Exhibit 1
- 86 -

Expert Report of Robert John Anders — Exhibit E.5



Fig. 1

U.S. Patent D411,386 to Horn, issued Jun. 22, 1999.

Exhibit 1
- 87 -

**EXHIBIT  F**

Exhibit 1
- 88 -

Expert Report of Robert John Anders                                    Exhibit F

Enlargements of Thumbnails in Table 4

**Exhibit 1**
**- 89 -**



U. S. Patent D448,218  Fig. 1 Perspective View

U. S. Patent D323,589  Fig. 1 Perspective View



Exhibit 1
- 90 -

Expert Report of Robert John Anders                                    Exhibit F.2



U. S. Patent D448,218  Fig. 2 Front Elevational View

U. S. Patent D323,589  Fig. 2 Left Side Elevational View



Exhibit 1
- 91 -



U. S. Patent D448,218  Fig. 3 Back Elevational View

U. S. Patent D323,589  Mirror Image of Fig. 2



**Exhibit 1**
**- 92 -**



U. S. Patent D448,218  Fig. 4 Right Side Elevational View

U. S. Patent D323,589  Fig. 3 End Elevational View



Exhibit 1
- 93 -

**Expert Report of Robert John Anders**                              **Exhibit F.5**



U. S. Patent D448,218  Fig. 5 Left Side Elevational View

U. S. Patent D323,589  Mirror Image of Fig. 3



**Exhibit 1**
**- 94 -**



U. S. Patent D448,218  Fig. 6 Top Plan View

U. S. Patent D323,589  Fig. 4 Top Plan View



**Exhibit 1**
**- 95 -**



U. S. Patent D448,218  Fig. 7 Bottom Plan View



U. S. Patent D323,589  Fig. 5 Bottom Plan View



**Exhibit 1**

**EXHIBIT  G**

**Exhibit 1**

**- 97 -**

**Expert Report of Robert John Anders**                                    **Exhibit G**

Enlargements of Thumbnails in Table 6

**Exhibit 1**
**- 98 -**

Expert Report of Robert John Anders                              Exhibit G.1



**Exhibit 1**
**- 99 -**



**Exhibit 1**
**- 100 -**



**Exhibit 1**
**- 101 -**



**Exhibit 1**



**Exhibit 1**
**- 103 -**

Expert Report of Robert John Anders                    Exhibit G.6



**Exhibit 1**
**- 104 -**



**Exhibit 1**

**EXHIBIT  H**

**Exhibit 1**

Expert Report of Robert John Anders                                    Exhibit H

Enlargements of Thumbnails in Table 7

**Exhibit 1**
**- 107 -**



**Exhibit 1**
**- 108 -**



**Exhibit 1**
**- 109 -**



**Exhibit 1**
**- 110 -**



Expert Report of Robert John Anders                    Exhibit 11.4

**Exhibit 1**



**Expert Report of Robert John Anders**                    **Exhibit II.5**

**Exhibit 1**
**- 112 -**

Expert Report of Robert John Anders                                    Exhibit II.6



Exhibit 1
- 113 -

Expert Report of Robert John Anders                    Exhibit H.7



**Exhibit 1**

**EXHIBIT  I**

**Exhibit 1**

Expert Report of Robert John Anders                          Exhibit 1

Enlargements of Thumbnails in Table 8

Exhibit 1
- 116 -



Expert Report of Robert John Anders                    Exhibit I.1

Exhibit 1
- 117 -



**Expert Report of Robert John Anders**                                    **Exhibit I.2**

**Exhibit 1**



Expert Report of Robert John Anders                    Exhibit 1.3

**Exhibit 1**
**- 119 -**



Expert Report of Robert John Anders

Exhibit 1.4

**Exhibit 1**
**- 120 -**



Expert Report of Robert John Anders                    Exhibit 4.5

**Exhibit 1**
**- 121 -**



Expert Report of Robert John Anders                    Exhibit L.6

Exhibit 1
- 122 -



**Exhibit 1**

**- 123 -**

**EXHIBIT  J**

Exhibit 1
- 124 -

**Expert Report of Robert John Anders**                                                **Exhibit J**

Enlargements of Thumbnails in Table 9

**Exhibit 1**
**- 125 -**



**Exhibit 1**
**- 126 -**

Expert Report of Robert John Anders                                    Exhibit J.2



**Exhibit 1**
**- 127 -**



**Exhibit 1**
**- 128 -**



Expert Report of Robert John Anders                    Exhibit J.4

**Exhibit 1**
**- 129 -**

**Expert Report of Robert John Anders**                                    **Exhibit J.5**



**Exhibit 1**
**- 130 -**



Exhibit 1
- 131 -



**Exhibit 1**
**- 132 -**

**EXHIBIT  K**

Exhibit 1
- 133 -

**Expert Report of Robert John Anders**                          **Exhibit K**

List of Prior Art I Examined

**Exhibit 1**

**- 134 -**

**KOLCRAFT**

| D604,970 | 1695571 | 1839580 | 1975332 | 2287907 |
|---|---|---|---|---|
| D158030 | 2590315 | 2617999 | 2698443 | 2784420 |
| D181893 | 2873458 | 3018493 | RE25195 | 3064277 |
| 3092847 | 3095583 | 3103670 | 3158876 | 3162865 |
| 3183528 | 3187352 | 3233254 | 3546721 | 3706105 |
| 3837019 | 4008497 | D244890 | 4376318 | 4561138 |
| 4900011 | 5197154 | 5211498 | 5239714 | D339922 |
| D340598 | 5274863 | 5279006 | 5307531 | 5339470 |
| 5349709 | 5367725 | 5381570 | 5504951 | 5513399 |
| 5533715 | 5553336 | 5560055 | D375217 | 5581827 |
| 5615427 | D382718 | 5761755 | 5778465 | D397882 |
| 5826285 | 5867850 | 5867851 | D409411 | D411386 |
| D413025 | 5991944 | 6173462 | 6192535 | 6233759 |
| 6256814 | D448218 | 6332231 | 6385800 | D461645 |
| 6434767 | 6543070 | 6615424 | 6665895 | 6721971 |
| D494393 | D500213 | 6859957 | 6895611 | 6948197 |
| 6954949 | 6959462 | 7003821 | 7020914 | 7043779 |
| D534381 | D537277 | 2003/0177575 | 2004/0261174 | 2005/0144716 |
| 2005/0144717 | 2005/0144718 | 2005/0229308 | 2006/0037137 | 2006/0225207 |
| **1,695,571** | **1,839,580** | **1,975,332** | **2,287,907** | **D158,030** |
| **2,590,315** | **2,617,999** | **2,698,443** | **2,784,420** | **D181,893** |
| **2,873,458** | **3,018,493** | **RE25,195** | **3,064,277** | **3,092,847** |
| **3,095,583** | **3,103,670** | **3,158,876** | **3,162,865** | **3,183,528** |
| **3,187,352** | **3,233,254** | **3,546,721** | **3,706,105** | 844148 |
| 1611649 | 1878642 | 3400829 | 1627241 | 474406 |
| 1593834 | 729608 | **3,837,019** | 813521 | 871692 |
| 1155475 | 3426367 | **4,008,497** | 1752191 | 2641772 |

**Exhibit 1**
**- 135 -**

| | | | | |
|---|---|---|---|---|
| 2834031 | 3195152 | 3571819 | 3800341 | 3813703 |
| 3874005 | **D244,890** | D235239 | 3103670 | 3195152 |
| 3309718 | 3430273 | 3789439 | **4,376,318** | 1417253 |
| 2553579 | 2958084 | 3183528 | 3900907 | 3924280 |
| **4,561,138** | 1102140 | 1604703 | 2132988 | 2536357 |
| 2739320 | **4,900,011** | D187138 | D196558 | 1260886 |
| 1374333 | 1413068 | 1479967 | 2563915 | 2588722 |
| 2837752 | 3162865 | 3430271 | 3886607 | 3983585 |
| 4077623 | 4415151 | 4516767 | 4538309 | 4569515 |
| 1128085 CA | 1129154 CA | 2026417 DE | **5,197,154** | 1374333 |
| 2523422 | 2574079 | 3605139 | 4008499 | 4688280 |
| 4703525 | 4811437 | **5,211,498** | 1520134 | 2066182 |
| 4069524 | 4131378 | 4357735 | 4611945 | 4811437 |
| 4881776 | 4934025 | **5,239,714** | 4376318 | 4688280 |
| 4811437 | 4934025 | 4985948 | **D339,922** | D304523 |
| 2586247 | 3162866 | 3187352 | 3351323 | 3474472 |
| 3924280 | 4073017 | 4815153 | 4837875 | 4900011 |
| **D340,598** | D133624 | D167739 | D171620 | D179301 |
| D180407 | **5,274,863** | 485081 | 1204416 | 1252824 |
| 1277781 | 1543814 | 4375110 | 4550456 | 4941453 |
| **5,279,006** | 1211730 | 1374333 | 1413068 | 1630941 |
| 1782217 | 2287907 | 2464866 | 2486054 | 2486067 |
| 2490296 | 2498203 | 2561637 | 2569937 | 2607052 |
| 2617999 | 2629110 | 2659903 | 2784420 | 2901755 |
| 2908021 | 2922169 | 2942750 | 3091249 | 3165760 |
| 3183528 | 3430273 | 3605139 | 3789439 | 3924280 |
| 4008497 | 4008499 | 4044411 | 4069524 | 4070716 |
| 4073017 | 4186454 | 4202065 | 4357735 | 4376318 |

**Exhibit 1**

**- 136 -**

| | | | | |
|---|---|---|---|---|
| 4538309 | 4561128 | 4561138 | 4573224 | 4688280 |
| 4703525 | 4811437 | 4848793 | 4934025 | 952496 CA |
| 43051 DE2 | 481037 DE2 | 1557841 FR | 2361846FR | **5,307,531** |
| 3849812 | 4996732 | 5048135 | 2646763 FR | **5,339,470** |
| 485081 | 2493181 | 2553087 | 3078478 | 3644947 |
| 4967432 | 5163191 | **5,349,709** | 3145445 | 3735430 |
| 3848277 | 4694516 | 4744114 | **5,367,725** | 244217 |
| 826590 | 2646577 | 2922169 | 4008499 | 5228154 |
| 5279006 | **5,381,570** | 2563446 | 4811437 | 5197154 |
| 5228154 | 5239714 | 5279006 | 5293656 | 1557841 FR |
| **5,504,951** | 5239714 | 5243718 | 5353451 | 5381570 |
| 5446931 | 5454124 | **5,513,399** | 5243718 | 5279006 |
| 5293656 | 5353451 | 5358220 | **5,533,715** | 2742391 |
| 3050287 | 3273862 | 3494596 | 3672638 | 4576364 |
| 4852194 | 5076545 | 5152508 | 5358025 | 5407178 |
| 5460409 | 5465941 | 991925 CA | **5,553,336** | 2569555 |
| 3165760 | 4811437 | 5077846 | 5163190 | 5172435 |
| 5349709 | **5,560,055** | 1533636 | 2491036 | 2561637 |
| 3018493 | 3550601 | 4044411 | 4070716 | 4376318 |
| 4561138 | 4573224 | 4651367 | 4688280 | 4692953 |
| 4811437 | 4837875 | 4934025 | 4985948 | 5197154 |
| 5228154 | 5239714 | 5243718 | 5279006 | 5293656 |
| 5353451 | 5381570 | 5394574 | **D375,217** | D181805 |
| D340598 | D350662 | D353750 | **5,581,827** | 2014904 |
| 2369885 | 2486054 | 2589805 | 2698443 | 2784420 |
| 2816295 | 3018493 | 4070716 | 4202065 | 4376318 |
| 4483026 | 4538309 | 4614454 | 4692953 | 4710049 |
| 4739527 | 4750223 | 4765004 | 4811437 | 4819285 |

**Exhibit 1**
**- 137 -**

| | | | | |
|---|---|---|---|---|
| 4837875 | 4934025 | 4985948 | 5241716 | 5339470 |
| **5,615,427** | 5239714 | 5349709 | 5497517 | 5504951 |
| **D382,718** | D304523 | D323589 | 1435299 | 3103948 |
| 4985948 | 5172435 | 5339470 | **5,761,755** | 5211498 |
| 5454124 | 5483710 | 5542134 | 5581827 | **5,778,465** |
| 961669 | 1204416 | 2553087 | 2688997 | 3078478 |
| 3574872 | 3644947 | 3735430 | 4073017 | 4750223 |
| 4967432 | 4999863 | 5115524 | 5339470 | 5349709 |
| 5535457 | 5553336 | 5555577 | 5615427 | **D397,882** |
| D304523 | 5163191 | 5349709 | 5581827 | **5,826,285** |
| Re25195 | D145052 | D158030 | D186358 | D192072 |
| D193326 | D197551 | D244890 | D257299 | D281745 |
| D304523 | D316339 | D323589 | D339922 | D366978 |
| 540863 | 1211730 | 1374333 | 1413068 | 1630941 |
| 1779060 | 1782217 | 1975332 | 2287907 | 2308608 |
| 2464866 | 2486054 | 2486067 | 2490296 | 2491036 |
| 2498203 | 2523422 | 2561637 | 2563446 | 2569937 |
| 2574079 | 2590315 | 2607052 | 2617999 | 2624054 |
| 2629110 | 2650375 | 2659903 | 2697843 | 2698443 |
| 2710976 | 2784420 | 2790978 | 2809382 | 2837752 |
| 2873458 | 2901755 | 2908021 | 2913739 | 2922169 |
| 2942750 | 2958084 | 2992441 | 3018493 | 3063065 |
| 3064277 | 3091249 | 3092847 | 3095583 | 3103670 |
| 3127620 | 3158876 | 3165760 | 3173155 | 3183527 |
| 3183528 | 3206772 | 3233254 | 3296633 | 3309718 |
| 3430273 | 3474472 | 3605139 | 3777321 | 3789439 |
| 3800341 | 3924280 | 4008497 | 4008499 | 4044411 |
| 4069524 | 4070716 | 4073017 | 4186454 | 4202065 |

**Exhibit 1**
**- 138 -**

| | | | | |
|---|---|---|---|---|
| 4357735 | 4376318 | 4433447 | 4455697 | 4483026 |
| 4493120 | 4499619 | 4538309 | 4561138 | 4573224 |
| 4599832 | 4635305 | 4651367 | 4669138 | 4683600 |
| 4688280 | 4692953 | 4703525 | 4710049 | 4739527 |
| 4750223 | 4811437 | 4815153 | 4819285 | 4837875 |
| 4899496 | 4900011 | 4921369 | 4934025 | 4967432 |
| 4985948 | 5025517 | 5172435 | 5193234 | 5197154 |
| 5211498 | 5212841 | 5228154 | 5239714 | 5241716 |
| 5243718 | 5279006 | 5293656 | 5339470 | 5353451 |
| 5358220 | 5363521 | 5367725 | 5377368 | 5381570 |
| 5446931 | 5504951 | 5553336 | 5664267 | 5706533 |
| 0952496 CA | 1557841 FR | 2361846 FR | 043051 DE | 0481037 DE |
| **5,867,850** | D366978 | 961669 | 1204416 | 2553087 |
| 2688997 | 2992440 | 3078478 | 3574872 | 3644947 |
| 3735430 | 4073017 | 4433447 | 4750223 | 4890341 |
| 4967432 | 4999863 | 5115524 | 5339470 | 5349709 |
| 5535457 | 5553336 | 5555577 | 5615427 | **5,867,851** |
| Re25195 | D145052 | D158030 | D186358 | D192072 |
| D193326 | D197551 | D244890 | D257299 | D281745 |
| D304523 | D316339 | D323589 | D339922 | D366978 |
| 540863 | 1211730 | 1374333 | 1413068 | 1630941 |
| 1779060 | 1782217 | 1975332 | 2287907 | 2308608 |
| 2464866 | 2486054 | 2486067 | 2490296 | 2491036 |
| 2498203 | 2523422 | 2561637 | 2563446 | 2569937 |
| 2574079 | 2590315 | 2607052 | 2617999 | 2624054 |
| 2629110 | 2650375 | 2659903 | 2697843 | 2698443 |
| 2710976 | 2784420 | 2790978 | 2809382 | 2837752 |
| 2873458 | 2901755 | 2908021 | 2913739 | 2922169 |

**Exhibit 1**
**- 139 -**

| | | | | |
|---|---|---|---|---|
| 2942750 | 2958084 | 2992441 | 3018493 | 3063065 |
| 3064277 | 3091249 | 3092847 | 3095583 | 3103670 |
| 3127620 | 3158876 | 3165760 | 3173155 | 3183527 |
| 3183528 | 3206772 | 3233254 | 3296633 | 3309718 |
| 3430273 | 3474472 | 3605139 | 3777321 | 3789439 |
| 3800341 | 3924280 | 4008497 | 4008499 | 4044411 |
| 4069524 | 4070716 | 4073017 | 4186454 | 4202065 |
| 4357735 | 4376318 | 4433447 | 4455697 | 4483026 |
| 4493120 | 4499619 | 4538309 | 4561138 | 4573224 |
| 4599832 | 4635305 | 4651367 | 4669138 | 4683600 |
| 4688280 | 4692953 | 4703525 | 4710049 | 4739527 |
| 4750223 | 4811437 | 4815153 | 4819285 | 4837875 |
| 4899496 | 4900011 | 4921369 | 4934025 | 4967432 |
| 4985948 | 5025517 | 5172435 | 5193234 | 5197154 |
| 5211498 | 5212841 | 5228154 | 5239714 | 5241716 |
| 5243718 | 5279006 | 5293656 | 5339470 | 5353451 |
| 5358220 | 5363521 | 5367725 | 5377368 | 5381570 |
| 5542134 | 5553336 | 5664267 | 5706533 | 0952496 CA |
| 1557841 FR | 2361846 FR | 043051 DE | 0481037 DE | **D409,411** |
| D366978 | 1374333 | 1413068 | 2490296 | 2574079 |
| 2650375 | 2913739 | 3777321 | 4186454 | 4433447 |
| 4739527 | 4985948 | 5553336 | 5560055 | 5581827 |
| **D411,386** | D366778 | D399669 | **D413,025** | D304523 |
| D366978 | 1374333 | 1413068 | 2490296 | 2574079 |
| 2650375 | 2913739 | 3777321 | 4186454 | 4433447 |
| 4739527 | 4811437 | 4985948 | 5553336 | 5560055 |
| 5581827 | **5,991,944** | 2553087 | 3848277 | 4967432 |
| 5339470 | 5553336 | 5615427 | 5778465 | **6,173,462** |

**Exhibit 1**
**- 140 -**

| | | | | |
|---|---|---|---|---|
| 2536731 | 2553087 | 3644947 | 5349709 | 5555577 |
| 5615427 | 5778465 | 5918329 | 6058528 | **6,192,535** |
| 869061 | 1412935 | 1839580 | 1845814 | 2433504 |
| 3487479 | 3799606 | 4790340 | 4796314 | 4846204 |
| 4945584 | 5161269 | 5163191 | 5339470 | 5341530 |
| 5553336 | 5615427 | 5778465 | 5813064 | 5862548 |
| 5867850 | 5918329 | 5991944 | 935821 FR | 188935 GB |
| 2 161 070 GB | **6,233,759** | 4073017 | 4967432 | 5339470 |
| 5553336 | 2 550 929 FR | 2 152 813 GB | **6,256,814** | 4688280 |
| 4739527 | 4811437 | 5239714 | 5279006 | 5339470 |
| 5353451 | 5358220 | 5465439 | 5504951 | 5697111 |
| 5699997 | 5819342 | 5937457 | **D448,218** | D397882 |
| 4376318 | 5349709 | 5367725 | **6,332,231** | 3735430 |
| 5349709 | 5778465 | 5918329 | **6,385,800** | 5163191 |
| 5228154 | 5530977 | 5781944 | 5906014 | 6125483 |
| 6202229 | **D461,645** | 4739527 | 5339470 | D382718 |
| 5752283 | D448218 | **6,434,767** | 534434 | 961669 |
| 1204416 | 1413068 | 1574226 | 2287907 | 2553087 |
| 2691177 | 2784420 | 2809382 | 3018493 | 3206772 |
| 3311935 | 3644947 | 3735430 | 4070716 | 4750223 |
| 4921369 | 4945584 | 5339470 | 5349709 | 5553336 |
| 5555577 | 5778465 | 5845349 | 5862548 | 5867850 |
| D407914 | D407915 | 5991944 | 6035466 | 6192535 |
| 6233759 | **6,543,070** | 4694516 | 5349709 | 5381570 |
| 5918329 | 6173462 | 6233759 | 221080 GB | **6,615,424** |
| 5446931 | 6170099 | 6256814 | 6305037 | 6336234 |
| 6349434 | 6473919 | 6510569 | 2002/0170111 | **6,665,895** |
| 4688280 | 4739527 | 4811437 | 5239714 | 5279006 |

**Exhibit 1**
**- 141 -**

| | | | | |
|---|---|---|---|---|
| 5339470 | 5353451 | 5358220 | 5465439 | 5504951 |
| 5697111 | 5699997 | 5819342 | 5937457 | 6123091 |
| 6256814 | 6421850 | 6467107 | 6473919 | 6510569 |
| 6568004 | 2003/0061657 | **6,721,971** | 5752283 | 6430762 |
| 6467108 | **D494,393** | 5544864 | D432339 | 6158067 |
| 6185762 | 6665895 | 2002/0166170 | 2003/0177574 | **D500,213** |
| 3438069 | 5553336 | 6178573 | 6418575 | 6430762 |
| 6434767 | | **6,859,957** | 2493181 | 2590315 |
| 2784420 | 2790978 | 3173155 | 4202065 | 4538309 |
| 4750223 | 4899496 | 4921369 | **6,895,611** | 2566790 |
| 2590315 | 3103669 | 4993551 | 5174447 | 5813064 |
| 6687927 | **6,948,197** | 4929113 | 5039118 | 5056805 |
| 5062179 | 5123768 | 5168601 | 5377368 | 5381570 |
| 5542151 | 5617592 | 5765958 | 5791804 | 5918329 |
| 6173462 | 6233759 | 6322098 | 6503018 | 6543070 |
| 6565111 | 6626452 | 6629801 | 6692178 | 2002/0166169 |
| **6,954,949** | 6539563 | 199957 133 AU | 2000-60689 JP | **6,959,462** |
| 2280913 | 2537539 | 2654098 | 2686922 | 2752614 |
| 3487479 | 3631547 | 4302857 | D351756 | 5813064 |
| D429929 | 6192535 | 6539563 | 6588033 | 6687927 |
| 6704949 | 2003/0070230 | 2003/0177574 | 2004/0074000 | 373479 TW |
| **7,003,821** | 2287907 | 3438069 | 3894304 | 4811437 |
| D365957 | 5553336 | 5697111 | 5778465 | 5845349 |
| 5862548 | 5933885 | 6131216 | 6131218 | 6170101 |
| 6178573 | 6178578 | 6192535 | 6418575 | 6430762 |
| 6434767 | 6510570 | 6578211 | D500213 | 6865756 |
| 6907626 | 6931677 | 2001/0000362 | 2003/0196263 | 2003/0196264 |
| 2004/0237191 | 2004/0261174 | 2005/0150046 | 2005/0166316 | 2005/0172400 |

**Exhibit 1**
**- 142 -**

| 2005/0198733 | **7,020,914** | 99636 | 398517 | 729950 |
|---|---|---|---|---|
| 888045 | 1397693 | 1549318 | 2377464 | 3590403 |
| 4868939 | 4977631 | **7,043,779** | 4666327 | 5056805 |
| 5349709 | 5377368 | 5381570 | 5504951 | 5542151 |
| 5615427 | 5617592 | 5761754 | 6123091 | 6196568 |
| 6256814 | 6467107 | 6503018 | 6510568 | 6516823 |
| 6682252 | 6711780 | 2004/0216277 | **D534,381** | 1839580 |
| 1975332 | 2287907 | D158030 | 2617999 | 2698443 |
| 2784420 | 3018493 | 3064277 | 3092847 | 3095583 |
| 3103670 | 3158876 | 3162865 | 3183528 | 3187352 |
| 3233254 | 3546721 | 3706105 | D244890 | 4376318 |
| 4561138 | 4900011 | 5211498 | 5239714 | D339922 |
| 5279006 | 5339470 | 5349709 | 5367725 | 5381570 |
| 5513399 | 5553336 | 5560055 | 5581827 | D382718 |
| 5778465 | D397882 | 5826285 | 5867850 | 5867851 |
| D409411 | D413025 | 5991944 | 6233759 | D448218 |
| 6385800 | 6615424 | 6721971 | D494393 | D500213 |
| 6859957 | 6895611 | 6954949 | 6959462 | 7003821 |
| 7020914 | 2004/0261174 | 2005/0144716 | 2005/0144717 | 2005/0144718 |
| 2005/0229308 | 2006/0037137 | **D537,277** | D448218 | D494393 |
| 6859957 | 6954949 | **DN/20030177575** | 2005/0144716 | **2005/0144717** |
| **2005/0144718** | **2005/0229308** | **2006/0037137** | **2006/0225207** | |

**Exhibit 1**
**- 143 -**

<u>**CERTIFICATE OF SERVICE**</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is **BALLARD SPAHR LLP**, 2029 Century Park East, Suite 800, Los Angeles, CA 90067-2909. On **August 11, 2011**, I served the within documents: **EXPERT WITNESS DISCLOSURE OF GRACO CHILDREN'S PRODUCTS INC.**

☒ **BY EMAIL:** I electronically served a true and correct copy of the **EXPERT WITNESS DISCLOSURE OF GRACO CHILDREN'S PRODUCTS INC.** to the following:

- **J. Rick Taché** (rtache@swlaw.com)
- **Deborah S. Mallgrave** (dmallgrave@swlaw.com, dmwilliams@swlaw.com)

☒ **BY MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below:

> J. RICK TACHÉ
> DEBORAH S. MALLGRAVE
> Snell & Wilmer
> Plaza Tower
> 600 Anton Blvd #1400
> Costa Mesa, CA  92626-7689

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on **August 11, 2011**, at Los Angeles, California.

_____
Kristine Nakashima

Exhibit 1
- 144 -

Exhibit 2

Exhibit 2
- 145 -

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| In re:<br>BABY TREND, INC.,<br>        Reorganized Debtor. | : <br> : <br> : <br> : | Bankruptcy Case No. 6:09-bk-34090-CB |
| GRACO CHILDREN'S PRODUCTS INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>BABY TREND, INC.,<br><br>        Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CASE NO. 2:10-CV-05907 JST |

**EXPERT REBUTTAL REPORT OF ROBERT JOHN ANDERS, IDSA**

## I.    INTRODUCTION

1.    I am the same Robert John Anders who submitted an Expert Report regarding infringement in this matter on August 10, 2011.

2.    I also submitted a Declaration in support of Graco's Opposition to Defendant Baby Trend, Inc.'s Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment; Memorandum of Points and Authorities on August 15, 2011.

3.    This report is in rebuttal to the Expert Report of Dr. J. Michael McCarthy, dated July 29, 2011 in which he opined on the validity of U.S. patent D448,218 (hereinafter the " '218 patent") as well as whether or not a series of accused products infringe the '218 patent. In my previous Expert Report, I addressed the question of infringement of the accused products. In this Expert Rebuttal Report, I only rebut the portions of Dr. McCarthy's report that dealt with validity.

1

**Exhibit 2**<br>**- 146 -**

## II.    MY WORKING KNOWLEDGE OF APPLICABLE LAWS OF VALIDITY

4.    I understand that a patent claim is invalid under 35 U.S.C. § 102 as being anticipated by the prior art if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.

5.    The ordinary observer test is the only test for design patent invalidity under § 102. (*Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1241 (Fed. Cir. 2009).)

6.    I understand that a design patent is subject to the nonobviousness requirement of 35 U.S.C. § 103.

7.    I also understand that there are differing views in the courts about the test for nonobviousness. I understand that the courts agree that a key portion of the nonobviousness inquiry under 35 U.S.C. § 103 is whether a designer of ordinary skill and ordinary creativity who designs articles of the type involved (which I will call the "ordinary designer") would have found it obvious to combine the teachings of the prior art to arrive at a single piece of art to compare with the claimed design.

8.    If the answer is that an ordinary designer would have found it obvious to combine those teachings to arrive at a "reconstructed" piece of prior art, then next question in the analysis is whether that reconstructed piece of prior art is substantially similar to the claimed design, and from whose perspective—the ordinary observer's or the ordinary designer's?

9.    It is the former question that I understand to be answered differently in the cases. For example, the Federal Circuit in *International Seaway v. Walgreens* said the perspective should be that of the ordinary observer. But the Federal Circuit six months earlier in *Titan Tire v. Case New Holland* also suggested that the perspective should be that of the ordinary designer. I will discuss my opinion from both perspectives.

10.    As I understand it, the teachings of prior art references can only be combined if the prior art references are so related that the appearance of certain ornamental features in one reference would have inherently suggested application of those features to another. The relevant viewer for such suggestion is a designer of ordinary capability, with ordinary creativity, who designs articles of the type presented.

11.    As I understand the law, the process of creating a combined piece of prior art for the nonobviousness analysis is that the ordinary designer must first identify a "primary"

2

**Exhibit 2**
**- 147 -**

reference – something in existence having design characteristics that are basically the same as the claimed design.

12. Then, the ordinary designer may use "secondary" references to modify the primary reference so that it has the same overall appearance as the claimed design.

13. Importantly, however, as I understand the law, the ordinary designer cannot simply select anything to be secondary references. Rather, the ordinary designer can only select secondary references that are so related to the primary reference that the appearance of certain ornamental features in the secondary references would suggest using those features, for example, using features from the same types of products. This is because an ordinary designer seeking ideas to improve a product's appearance would first look to similar devices, then try and move away from existing features.

14. References that are sufficiently related that they can be used in an obviousness combination are considered to be "analogous art," while references that are not sufficiently related to allow a combination are considered "nonanalagous art."

15. As to secondary references, I understand that they should not even be considered unless there is some suggestion in the prior art to use them to modify the basic design. *In re Borden*, 90 F.3d 1570, 1572 (Fed. Cir. 1996).

16. As I understand it, this law also has some contours. For example, when the modification merely involves giving an attractive appearance to a surface of an item and not otherwise changing its configuration, then the scope of analogous art is broader.

17. On the other hand, when a modification to a primary reference involves a change in configuration, the primary and secondary references must be from analogous arts. *In re Glavas*, 230 F.2d 447 (CCPA 1956).

18. I also understand any inquiry regarding validity has four parts. They are:

    18.1. "(1) determine the scope and content of the prior art relied upon to challenge patentability;

    18.2. (2) identify the difference between the prior art and the claimed invention;

    18.3. (3) determine the level of ordinary SKILL IN THE ART at the time of the invention; and

    18.4. (4) consider the objective evidence of so-called secondary considerations.....
    these secondary considerations include such factors as COMMERCIAL SUCCESS,

UNEXPECTED RESULTS, THE FAILURE OF OTHERS to achieve the results of the invention, LONG FELT NEED which the invention fills, and COPYING of the invention by competitors."[1].

19. I now turn to the Expert Report of Dr. McCarthy and study and comment on his validity analysis.

## III.    THE EXPERT REPORT OF DR. J. MICHAEL MCCARTHY

20. In paragraph 6, Dr. McCarthy states "my education, work, teaching and research and help me develop a broad base of knowledge regarding machine design and mechanical systems design.  This field of technology encompasses machines in general, the structural members and components, such as slides and hinges, as well as computer-controlled systems such as robotic manipulators and use of these devices and automation systems and medical applications."

20.1.  Dr. McCarthy's background is not applicable to the issues in this case.  This case concerns itself with the ornamental design of a consumer product.  It has nothing whatsoever to do with any of the areas of expertise described by Dr. McCarthy.

20.2.  I have reviewed the list of Dr. McCarthy's expert testimony in the last four years. It does not appear that Dr. McCarthy has testified as an expert in a design patent case within the last 4 years.  I am not aware of whether he has ever testified as an expert in a design patent case.

21. In paragraph 16 of his report, Dr. McCarthy states his opinion that "one of ordinary skill in the art would have a Bachelor's degree in Mechanical Engineering with one or more years of experience in the design of mechanical devices."

22. I disagree.  I do not believe that the ornamental design of consumer products such as playards are designed by mechanical engineers.  Traditionally, such products are designed by industrial designers.  Mechanical engineers are generally involved in the specific detailed design of connectors and fasteners of such products, but never in the overall ornamental appearance of such products.

23. Continuing on in paragraph 16, Dr. McCarthy writes, "This opinion of ordinary skill is based, in part, on my experience guiding senior mechanical engineering students in

---

[1] *McCarthy's Desk Encyclopedia of Intellectual Property,* third edition.  J. Thomas McCarthy, Roger A. Schechter, David J. Franklyn.  The Bureau of National Affairs, Inc., Washington, D.C. 2005.  Page 410.

4

Exhibit 2
- 149 -

industry-based projects, working with graduate students in robotics, as well as my experience supervising engineers in the design and support of a robotic radiosurgery system.

24.   People who design robotics and radiosurgery systems are very unlikely to ever be involved in the design of consumer products for the children's market, except for the possibility of robotic toys.

25.   In paragraph 19 of his report Dr. McCarthy writes "It is my opinion that the features of the '218 patent are found in prior art references and therefore the '218 patent would have been invalid as being obvious to one of ordinary skill in the art at the time the '057 patent was filed."  This appears to be an error, as there is no '057 patent at issue in or relevant to this case.

26.   In paragraph 22, Dr. McCarthy analyzes the "Technology of the '218 Patent."

27.   In the past twenty years in analyzing design patents, I have never heard the term "The Technology" of a design patent.  It is inappropriate to refer to the "technology" of the '218 patent, which is a design patent.  The patent laws specifically provided that it is utility patents, not design patents, that are directed to "technology" (i.e., useful functions).  Design patents are by law directed to ornamentation.

28.   Continuing in paragraph 22, Dr. McCarthy states that there are "five distinct features" of the ornamental design claimed in the '281 Patent.  I believe Dr. McCarthy meant to write the '218 Patent, and not the '281 Patent.  Dr. McCarthy proceeds to list what he considers to be five distinct features claimed in the '218 Patent.

29.   It appears to me that Dr. McCarthy's purported "five distinct features" of the '218 Patent are an effort to create a written claim construction of the design that is claimed.  It is my understanding that the drawings of the design patent themselves are the best description of what is claimed, and that a written claim construction is not necessary.

30.   Even if it were proper to provide a written claim construction, in my opinion, Dr. McCarthy's descriptions of the purported "five distinct features" are neither accurate nor adequate descriptions of the design claimed in the '218 Patent.

31.   I address each of Dr. McCarthy's descriptions in the table below:

5

**Exhibit 2**
**- 150 -**

| TABLE 10 | | |
|---|---|---|
| **DR. MCCARTHY'S CLAIM CONSTRUCTION OF THE '218 PATENT** | | |
| Dr. McCarthy's Claim Construction of Five Distinct Features | U.S. Patent D448,218 | My Comments |
| "(i) the leg is curved so that it forms a smooth arc;" |   Fig. 1 | There are four legs positioned and projecting outwardly from the corners of the play yard.  Dr. McCarthy discusses only a single leg and eliminates any discussion of the overall appearance of the curved legs of a playard. |
| "(ii) the arc of each leg is concave inwardly along the diagonal of the base:" |   Fig. 1 | The arc of each leg is a convex curve that bows outwardly along the diagonal of the base.  The dominant feature of the legs in this ornamental design is that they bow outwards, i.e., they are convex.  Why Dr. McCarthy would state they are concave is puzzling.  The drawings present the outward-facing sides of the legs. |

6

**Exhibit 2**
**- 151 -**

| | | |
|---|---|---|
| "(iii) the leg is cloth covered;" | <br>Fig. 1 | There is no teaching that the leg is cloth covered, since there are no solid lines indicating a cloth covering. The patent claims only that which is disclosed in solid lines and not as shown in any environmental or unclaimed portions of the design patent. |
| "(iv) the curved leg has an inflection point at the upper end, where the arc reverses to meet the upper support: and" | <br>Fig. 2 | Neither an ordinary observer nor a designer skilled in the art can accurately indicate the inflection point where the dominant convex curvature transitions into a concave curve. |
| "(v) the curved leg does not have a similar inflection point at the bottom end of the leg, which instead curves towards the base." | <br>Fig. 2 | I have never previously seen claim construction of a design patent indicating what something "does not have". It is improper to construe what is not shown. |

32.    In addition to these specific inaccuracies, Dr. McCarthy's proposed constructions do not perform the correct analysis. As I understand it, to the extent claims of a design patent are construed, they must be construed in the context of the overall ornamental appearance taught by the '218 Patent. Rather than look at the overall ornamental appearance, Dr. McCarthy's seriously flawed claim construction is limited to a single leg, and even that is fails to accurately describe the ornamental appearance claimed by the '218 Patent.

7

Exhibit 2
- 152 -

Indeed, Dr. McCarthy's "construction" appears to be an attempt to reduce the innovative design of the '218 Patent to a handful of geometric constructs that are entirely divorced from the overall ornamental appearance in an effort to assist his analysis.

33.    In my experience, ordinary observers do not dissect designs into minute components as Dr. McCarthy attempts to do here.  Rather, ordinary observers take in the overall design.

34.    I found it interesting that Dr. McCarthy provided no visual comparative documentation to support any of his opinions.  Nor did he refer to the requirement for evaluating the overall ornamental appearance and the visual impression that it makes when conducting his invalidity analysis.

35.    In paragraph 26, Dr. McCarthy simply restates the erroneous findings of the Board of Patent Appeals.  I discussed the errors in the Board's decision at length in my infringement Expert Report and my Declaration in support of Graco's opposition to Baby Trend's Motion for Summary Judgment.

36.    In paragraph 38, Dr. McCarthy lists three prior art patents that he believes can be combined to invalidate the '218 patent.  These patents are:

36.1.    U.S. Patent No.D304,523 entitled "Foldable Playard", issued on November 14, 1989 to James M. Dillner and Nathanael Saint, and assigned to Graco Metal Products Inc. (the "'523 Patent");

36.2.    U.S. Patent No. D397,563 entitled "Table Base", issued on September 1, 1998 to Andrea Walters-Dowding, Lynn. Lippert, and Durward L. Staten (the '563 Patent);

36.3.    U. S. Patent D411,062 entitled "Shelving Support Spindle", issued on June 15, 1999 to Raymond Grosfillex (the '062 Patent).

37.    In paragraph 42, Dr. McCarthy states: "The '523 Patent teaches a play yard with a straight leg that is covered in cloth, while the '563 patent teaches a curved leg that forms an arc that is concave towards the diagonal of the base.  Finally the '062 Patent shows a curved support that has an inflection point where it connects at the top.  In my opinion, it would have been obvious to one of ordinary skill in the art to combine these features in order to form the design in the '218 Patent."

8

**Exhibit 2**
**- 153 -**

38. In short, Dr. McCarthy's obviousness analysis is nothing more than conclusory statements with no facts (or even opinions) to back them up. This unsubstantiated opinion is without merit.

39. I have examined the prior art references Dr. McCarthy discussed in his expert report, and in my opinion, an ordinary designer would not find it obvious to combine these references. I note that the '218 Patent is clearly more than just a change in surface ornamentation over the prior art playards. Rather, it is a material modification in the basic form of a playard. For that reason, an ordinary designer would look to analogous art—other playards or play pens.

40. Moreover, even if an ordinary designer did combine the references, they would not add up to a single piece of art that an ordinary observer (or an ordinary designer) would find to be substantially similar to the design claimed in the '218 Patent.

41. In the table below, I make a visual comparison between the design claimed in the '218 design patent and the three prior art examples cited by Dr. McCarthy as making obvious the '218 design patent.

| TABLE 11 | | |
|---|---|---|
| **DR. MCCARTHY'S OBVIOUSNESS ANALYSIS OF THE '218 PATENT** | | |
| U.S. Patent D488,218 | Dr. McCarthy's Cited Prior Art | Comments |
|   Fig. 1 |   U.S. Patent D304,523  Fig. 1 | The '523 Patent is for a playard in which the legs are straight and covered while the '218 patent teaches a play yard in which the legs are curved outwardly and not covered. In short, the '523 Patent is just an ordinary playard, and because it exhibits nothing that departs from the standard, straight-leg design, it does not support a case for invalidity. |

9

Exhibit 2
- 154 -



| Fig. 1 | U.S. Patent D397,563 Fig. 1 | In my Expert Report, I had considered U.S. Patent No. D409,420 entitled "Table Base," issued on May 11, 1999 to Andrea Walters-Dowding, Lynn. Lippert, Kent Shaeffer and Durward L. Staten (the '420 Patent) which was a continuation in part of the '563 Patent. The '563 and the '420 Patents disclose an ornamental design for a table base. A table is in an entirely different type of device than a playard. Because a table is so different from a playard, an ordinary designer would not look to the '563 patent (or the '420) patent when creating the industrial design for a playard, and therefore, the '563 Patent is non-analogous art, and it would be improper to include it in the obviousness analysis as either a primary or a secondary reference.<br><br>Even if one could properly include the '563 patent in the obviousness analysis, an ordinary designer would not find it obvious to modify a prior art playard with the table design shown in the '563 patent.<br>This is because, although both the '563 patent and the '420 patent show tables with curved legs, they have an overall appearance that is substantially different from that taught by the '218 patent. For example, the '563 patent has a scrolled foot portion that provides a dramatically different overall visual |

10

Exhibit 2
- 155 -

| | | |
|---|---|---|
| | | impression. Thus it would not be obvious to a designer skilled in the art to appropriate and incorporate this design element into the design for the '218 patent. Therefore the '563 patent cannot serve as either a primary reference or secondary reference in an invalidity analysis. |
| Fig. 2 | U.S. Patent D411,062  Fig. 3 | The '062 patent is for a Shelving Support Spindle. By its own terms, the '062 patent discloses a device that is used to support a shelf. Shelf support is a completely different area of designs from playards. Consequently, an ordinary designer would not look to the '062 patent when creating the industrial design for a playard. Thus, the '062 patent does not disclose analogous art, and accordingly, it would be improper to include it in an obviousness analysis here as either a primary or a secondary reference

Moreover, the spindle described in the '062 patent has an overall appearance that is substantially different from that taught by the '218 Patent. Notably, it claims one threaded end (that likely is threaded into the bottom of a shelf) and an end with a peg. These ends give the spindle a decidedly different overall visual effect than the curved legs for a playard claimed in the '218 patent. Thus it would not be obvious to a designer skilled in the art to appropriate |

11

Exhibit 2
- 156 -

| | | and incorporate this design element into the design for the '218 patent. Therefore the '062 patent cannot serve as either a primary reference or secondary reference in an invalidity analysis. |
|---|---|---|

42.  While the straight-leg playard could serve as a primary reference to the ordinary designer, none of the two above prior art examples cited by Dr. McCarthy could serve as either primary or secondary examples to a designer skilled in the art to which the patent pertains, making the '218 design patent invalid due to obviousness as asserted by Dr. McCarthy.

## IV.   I NOW CONDUCT MY VALIDITY ANALYSIS

43.  As stated previously, my validity analysis is divided into four parts. They are:

    43.1.   determine the scope and content of the prior art relied upon to challenge patentability;

    43.2.   identify the difference between the prior art and the claimed invention;

    43.3.   determine the level of ordinary skill in the art at the time of the invention; and

    43.4.   consider the secondary considerations of non-obviousness, including such factors as:

        43.4.1. commercial success;

        43.4.2. unexpected results;

        43.4.3. failure of others;

        43.4.4. long felt need which the invention fills; and

        43.4.5. copying of the invention by competitors.

44.  I reviewed approximately twelve hundred prior art patents, including for cribs, playards, and bassinets. Also, although I do not believe they are analogous art, the approximately 1,200 prior art designs I reviewed included tables and chairs. I also reviewed the prior art Dr. McCarthy identified. I was unable to find a single prior art example that replicated or even came close to the ornamental design claimed in the '218 patent. My findings are supported by the prior art Dr. McCarthy has identified. He has been forced to rely on two

**Exhibit 2**
**- 157 -**

references, each from dramatically different design fields, to try to cobble together what he believes is a combination that renders the '218 Patent obvious. They do not!

45.  Although it is my opinion that Dr. McCarthy's secondary references are non-analogous art, and therefore are not appropriate for consideration in the obviousness analysis, I identified the substantial differences between the prior art and the claimed invention.

45.1.  The vast majority of the related products, including straight-leg playard shown in the '523 patent, had legs that were substantially straight. I found no prior art in which there were four elongated, cylindrically shaped legs having a simple convex shape projecting outwards from the product.

45.2.  The '563 patent cited by Dr. McCarthy, which is substantially similar to the '420 patent (both patents have common inventors) that I cited in my initial Expert Report, teaches away from the '218 design patent with its scrolled foot portion, providing a dramatically different overall appearance from that taught by the '218 design patent. Neither an ordinary observer nor an ordinary designer would believe that the table legs of the '563 patent are substantially similar in appearance to the curved legs for a playard of the '218 Patent.

45.3.  The '062 patent cited by Dr. McCarthy has a different arc; different proportions and different top and bottom terminations to the arc than taught by the '218 design patent. Consequently, neither an ordinary observer nor an ordinary designer would believe that the shelf spindle of the '062 Patent is substantially similar in appearance to the curved legs for a playard of the '218 Patent.

46.  A person of ordinary skill in the art – in this case, the ordinary designer – would have a bachelor's degree in industrial design and some experience creating the design for children's products.

47.  Several secondary considerations of non-obviousness bolster the fact that the '218 Patent is not obvious:

47.1.  **Commercial Success and Long Felt Need.** First, the complete absence of any similar products prior to the '218 patent, coupled with the immediate success of the design, shows that there was a long-felt, pent-up need for such a product. I understand that the sales of the patented design exceeded all expectations, and this makes sense, given the superlatives that have been lauded on the design. For

13

**Exhibit 2**
**- 158 -**

example, I have read Mr. Schoettelkotte's expert report, in which he discusses the fact that this design improved the appearance of playards such that they began to be used in the home and left in place in living areas. The more attractive playards are more useful to parents with babies and small children because they can be left set up without detracting from the décor of their homes.

47.2. **Unexpected Results.** No one had thought that by bowing the legs of these products outwards, that they would have turned an essentially static product into a softer, more feminine and desirable product.

47.3. **Failure of Others.** As evidenced by the prior art, all of the other efforts to create a new look for playards retained the straight leg design, and failed to create a new softer overall appearance.

47.4. **Copying of the Invention By Competitors.** This breakthrough design has now been copied by a number of competitors, including Baby Trend. As Mr. Schoettelkotte discussed in his expert report, Baby Trend specifically referenced Graco's "wave" design (which I understand to be another term used for the curved-leg design) when designing its own products. It appears that Baby Trend specifically set out to copy Graco's curved-leg design.

V.    **MY CONCLUSIONS REGARDING VALIDITY**

48.    I found no prior art reference that taught the ornamental design claimed in the '218 patent, and the design was not anticipated. I note that Dr. McCarthy does not argue that the '218 Patent is invalid as anticipated.

49.    The vast amount of prior art dealing with related products, i.e., playards, bassinets and cribs, had straight legs, without any teaching of curved legs. The fact is that the design claimed in the '218 patent was truly innovative, and broke new ground in the design of playards.

50.    Although it appears that there is no longer a requirement that prior art include an express teaching, suggestion, or motivation to support obviousness, I understand that such a teaching is a helpful insight into the obviousness inquiry. In my review of the prior art, I did not find any explicit teaching, suggestion or motivation that would have directed a designer of ordinary skill in the art to combine certain ornamental features in one reference with ornamental features found in a different prior art reference.

14

**Exhibit 2**
**- 159 -**

**CERTIFICATE OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is BALLARD SPAHR LLP, 2029 Century Park East, Suite 800, Los Angeles, CA 90067-2909. On **August 19, 2011**, I served the within documents:

**EXPERT REBUTTAL REPORT OF ROBERT JOHN ANDERS, IDSA**

☒ **BY MAIL**: by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below:

> J. RICK TACHÉ
> **Snell & Wilmer**
> Plaza Tower
> 600 Anton Blvd #1400
> Costa Mesa, CA 92626-7689

☒ **BY EMAIL**: I electronically filed a true and correct copy of the EXPERT REBUTTAL REPORT OF ROBERT JOHN ANDERS, IDSA to the following:

- **Deborah S Mallgrave**
  dmallgrave@swlaw.com, dmwilliams@swlaw.com
- **Michael B Reynolds**
  mreynolds@swlaw.com
- **Jasmin Yang**
  jyang@swlaw.com, kcollins@swlaw.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

pos

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on **August 19, 2011**, at Los Angeles, California.

_____/s/ Lisa Kwon_____

4

**Exhibit 2**
**- 160 -**

*Graco Children's Products, Inc. v. Baby Trend, Inc.*
**US District Court, Central District of California, Case No. 2:10-cv-05897-JST**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2011, I electronically filed the document described as **Notice of Motion and Motion in Limine to Exclude the Infringement and Invalidity Analysis of Graco's Expert Robert Anders** with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Penny M. Costa
costap@ballardspahr.com
Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909

Attorneys for Plaintiff Graco Children's Products Inc.
Tel:   424-204-4331
Fax:   424-204-4350

Lynn E. Rzonca
rzoncal@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103

Attorneys for Plaintiff Graco Children's Products Inc.
Tel:   215-665-8500
Fax:   215-864-8990

Katrina Quicker
quickerk@ballardspahr.com
Cecilia Andrews
andrewsc@ballardspahr.com
Ballard Spahr LLP
999 Peachtree Street NE, #1000
Atlanta, GA  30309

Attorneys for Plaintiff Graco Children's Products Inc.
Tel:   678-420-9300
Fax:   678-420-9301

Dated:  October 31, 2011                    SNELL & WILMER L.L.P.


                              By: *s/Deborah S. Mallgrave*
                                  J. Rick Taché
                                  Deborah S. Mallgrave
                                  Attorneys for Defendant Baby Trend, Inc.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000